Wayne E. NICKERSON, Appellant,

v.

UNIVERSITY OF ALASKA
ANCHORAGE,
Appellee.

No. S–8269.

Supreme Court of Alaska.

March 26, 1999.

Wayne E. Nickerson, pro se, Seward.

Mark E. Ashburn, Ashburn & Mason, Anchorage, for Appellee.

Before: MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

PER CURIAM

### I. INTRODUCTION

Wayne Nickerson, a former graduate student at the University of Alaska Anchorage,

appeals the University's decisions to remove him from an advanced teaching practicum and to dismiss him from the special education endorsement program. The primary questions in this case concern whether the University complied with its own handbook and course catalog and whether the University's dismissal of Nickerson satisfied due process. We conclude that the University complied with its own internal procedures, but remand for further findings as to whether the University comported with due process by giving Nickerson proper notice prior to his dismissal.

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

### A. *Factual Background*

In July 1994 Wayne Nickerson applied for admission to the University of Alaska Anchorage's Teacher Certification Program in Special Education. Nickerson was conditionally admitted to the graduate level certification program in December 1994.

In October 1995 Nickerson applied for placement in an advanced practicum for the 1996 spring semester. The practicum is a ten-week supervised, collaborative exchange between the University and a local school district. Practicum students are supervised by both a host teacher in the local school district and a University supervisor. Students receive daily feedback from the host teacher and weekly visits from the University supervisor. The practicum is the culminating experience for students seeking an endorsement in special education. Admission into this final phase of professional preparation is a faculty decision which is separate from entry into the graduate program. Final decisions on the practicum site and host teacher are made by the school district and University faculty, not by the practicum student.

In February 1996 University faculty obtained a practicum placement for Nickerson at Colony High School in Palmer. Dr. Cable Starlings was Nickerson's University supervisor. Carol Boquard was Nickerson's host teacher at Colony High School.

During Nickerson's practicum, Professor Starlings spoke with Nickerson on an ongoing basis and met with him and his host teacher on February 28 and again on March 13. During the March 13 meeting, Boquard reported that Nickerson "was having difficulty with [working] relationships and his role in the classroom," and "was not working effectively with his host teachers." Nickerson told Starlings that he found his role difficult and that he had disagreed with his host teacher on a student discipline issue. Despite Nickerson's assurances that he had corrected his behavior, Nickerson was given suggestions for improving his relationship with his host teachers. First, Nickerson was encouraged to listen more willingly and not to defend his position so aggressively when confronted with criticism from host teachers. Second, Nickerson was told to solicit support from his host teachers to improve his ability to relate effectively to them.

On Friday, March 15, Professor Starlings received an e-mail from Colony Principal Bill Harlow. Harlow indicated that he had spoken with Boquard that morning regarding the practicum. He indicated that Boquard had described a frustrating, unworkable situation stemming from Nickerson's failure to follow directions from her and from other teachers. Harlow informed Starlings that the "picture is a little more grim" than Starlings was led to believe during the March 13 conference, and suggested a meeting to try to "salvage something." Harlow stated that the "bottom line is that we won't let kids, teachers, or the system be compromised."

Professor Starlings promptly informed Dr. Alexander McNeill, Dean of the School of Education, of Harlow's message. Starlings noted that the message "clearly identifies a continuing problem with Mr. Nickerson's ability to effectively relate to supervisors." Starlings further informed McNeill that he would suspend Nickerson from his practicum as of Monday. Over the weekend, Starlings told Nickerson not to go to Colony on Monday or until such time as Starlings could meet with Colony personnel and investigate the matter.

Professor Starlings met with Principal Harlow and Carol Boquard at Colony High

School on the morning of Monday, March 18. During the meeting, Starlings determined that Boquard lacked trust in Nickerson, that Nickerson did not listen to or follow her suggestions, and that Nickerson resisted constructive criticism. Given the level of frustration expressed by Boquard, Starlings concluded that it was necessary to remove Nickerson from his practicum at Colony High School.

On the afternoon of March 18, Starlings and Dean McNeill met with Nickerson to notify him of his removal from the practicum. Starlings relayed the substance of his meeting with Harlow and Boquard. Starlings stated that the decision was based upon Nickerson's unwillingness to identify and correct his difficulties in dealing with faculty. While Starlings acknowledged that Nickerson may have a different interpretation of events, Starlings indicated that the situation brought to his attention was "not conducive to the learning of children and the work of teachers."

On Wednesday, March 20, Professor Starlings sent Nickerson written notice of his removal from the practicum. Starlings informed Nickerson of his right to appeal his removal, citing the relevant page of the course catalog. Starlings also notified Nickerson that he would bring the matter to the attention of the special education faculty, and request a decision on Nickerson's continued enrollment in the special education program.

On the same day, March 20, Dean McNeill met with the chairperson of the department of teacher education and five faculty members of the special education program to evaluate Nickerson's status in the special education endorsement program. The committee reviewed Nickerson's record in the special education program at the University and Nickerson's experience during his practicum at Colony High School. The committee unanimously voted to dismiss Nickerson from the special education endorsement program.

On Friday, March 22, Dean McNeill informed Nickerson of the faculty decision to dismiss him from the special education program. McNeill explained that the decision was based upon Nickerson's "repeated failure to respond to feedback regarding [his] general lack of professional behaviors," Nickerson's "repeated hostile and abrasive interaction with faculty in special education," and Nickerson's "verbal abuse and intimidation of other professionals." Dean McNeill stated that such conduct fell short of the standards for retention in the special education program as set forth in the special education student manual. Dean McNeill informed Nickerson of his right to appeal the decision to the Vice Chancellor of Academic Affairs, and included a highlighted passage of the course catalog describing Nickerson's right to appeal.

## B. *Procedural Background*

On March 20, 1996, Nickerson sent a letter to Vice Chancellor Roberta Morgan requesting that he be reinstated to his special education practicum. After receiving Dean McNeill's letter dismissing him from the special education program, Nickerson sent Vice Chancellor Morgan a second letter on March 26, alleging that the special education department failed to follow its advanced practicum handbook and denied him due process. Nickerson requested that the University investigate and correct the situation.

On March 27 Vice Chancellor Morgan met with Nickerson to allow him to explain the basis for his appeal.

On April 2 Nickerson sent another letter to Vice Chancellor Morgan restating his allegations that the procedures in the advanced practicum handbook had not been followed, and that he had been denied due process when Dean McNeill held a special faculty meeting to discuss his dismissal from the special education program without allowing him to be present. Nickerson requested reinstatement to the special education endorsement program.

On April 3 Vice Chancellor Morgan rendered her decision denying Nickerson's appeal. Dr. Morgan informed Nickerson that the proper avenue of appeal for his complaint about removal from his practicum was to the dean of the education department, and that the dean's decision on such a matter was final. Dr. Morgan denied Nickerson's appeal of his dismissal from the special education

endorsement program, concluding that no evidence existed to indicate that Dean McNeill's actions were arbitrary and capricious, clearly erroneous, or based on unlawful discrimination.

Dr. Morgan informed Nickerson that her decision was the final decision of the University on his appeal. She informed Nickerson that he could appeal her decision to superior court.

Nickerson appealed Dr. Morgan's final decision to the superior court. That court rendered a final order on this administrative appeal on July 28, 1997. The superior court held that the University had followed sufficiently the advanced practicum handbook in removing Nickerson from his practicum, that Nickerson was not denied due process, and that Nickerson was not a public interest litigant for attorney's fees purposes. The superior court declared the University to be the prevailing party, and awarded the University partial attorney's fees in the amount of $1,301.47.

Nickerson filed a timely notice of appeal.

## III. DISCUSSION

### A. Was Nickerson Afforded the Appropriate Procedure? [1]

■ Nickerson essentially presents three procedural points. First, Nickerson argues that the University failed to follow the advanced practicum handbook in removing him from his practicum. Second, Nickerson argues that the University did not follow the course catalog in his academic appeal. Third, Nickerson argues that he was denied due process under the Alaska and United States Constitutions.

1. Did the University follow the provisions of the advanced practicum handbook in removing Nickerson from his practicum?

Nickerson first contends that the University did not comply with the provisions of the advanced practicum handbook in removing him from his practicum. We disagree.

■ Two provisions of the advanced practicum handbook are relevant. The first, entitled "When Problems Arise," identifies eight steps that the University supervisor should take in resolving conflicts in the practicum. These steps include scheduling a conference between the University supervisor, the host teacher, and the practicum teacher; identifying reasons for the conference and allowing each person to express his or her concerns; outlining a plan for resolving the conflict; and monitoring progress toward resolving the conflict. Professor Starlings's efforts to resolve the conflict between Nickerson and his host teachers substantially complied with these guidelines.

Professor Starlings met with Nickerson and his host teacher, Carol Boquard, on February 28 and on March 13. At the March 13 conference, Boquard reported that Nickerson was "not working effectively with his host teachers." Nickerson informed Starlings that "he had a conflict with one female host teacher over a discipline issue with a student," but that he had corrected his behavior and that the relationship would improve. Nickerson was given two suggestions for ameliorating the problem: (1) he should be more willing to listen to his host teachers and not defend his position so aggressively when confronted with constructive criticism, and (2) he should solicit support from his host teachers to help improve his ability to relate to them effectively.

---

1. This court independently reviews "the merits of an administrative determination. No deference is given to the superior court's decision when that court acts as an intermediate court of appeal." *Bruner v. Petersen*, 944 P.2d 43, 47 n. 5 (Alaska 1997) (citation omitted). The issues as to whether the University complied with the advanced practicum handbook and the course catalog involve the University's application of its own regulations. Accordingly, this court's review is limited to determining if the decision was "arbitrary, unreasonable, or an abuse of discretion." *Szejner v. University of Alaska*, 944 P.2d 481, 484 n. 2 (Alaska 1997). The issue as to whether the University procedures comported with due process involve a question of law not requiring agency expertise. Accordingly, this court uses the "substitution of judgment" test. *Bruner*, 944 P.2d at 47 n. 5.

The second handbook provision at issue, entitled "Denial of or Removal from Advanced Practicum," outlines various unacceptable activities that may necessitate removal from the practicum and the appropriate procedures in such an event. It provides that students may be removed from the practicum for, among other things, "insubordination." If the University supervisor or host teacher learns that the practicum teacher has allegedly engaged in unacceptable activities, he or she is required to notify the department chairperson. After notification, the chairperson is required to suspend the practicum, inform all parties of the suspension, and schedule a conference with the University supervisor and practicum teacher to investigate the allegation. If the investigation produces adequate evidence that the practicum teacher engaged in unacceptable activities, the practicum teacher is to be immediately withdrawn from the practicum. Once again, Professor Starlings substantially complied with requisite procedures in removing Nickerson from the practicum.

On March 15, only two days after his last conference aimed at resolving problems between Nickerson and his host teacher, Professor Starlings received an e-mail from Colony High School Principal Bill Harlow. Harlow notified Starlings that the "picture is a little more grim" than Boquard had portrayed, and indicated that Nickerson was creating a frustrating, unworkable situation for his host teachers because he did not follow their directions. Harlow stated that the "bottom line is that we won't let kids, teachers, or the system be compromised."

After being notified of Nickerson's alleged pattern of disruptive insubordination, Starlings properly suspended Nickerson's practicum and investigated the charges. Starlings contacted Nickerson over the weekend and told Nickerson not to go to Colony on Monday or until such time as Starlings had met with Colony faculty. On March 18, Starlings met with Harlow and Boquard at Colony High School. Boquard relayed to Starlings that she felt Nickerson was resistant to constructive criticism, that he neither listened to nor followed her suggestions, and that she did not trust Nickerson. Starlings found adequate evidence of insubordination, and concluded that Nickerson's relationship with Boquard had deteriorated beyond the point of repair. Starlings and Dean McNeill subsequently informed Nickerson of the decision to remove him from the practicum.

Starlings's actions in attempting to resolve the conflict between Nickerson and Boquard, and in removing Nickerson from the practicum, substantially complied with the advanced practicum handbook. Starlings's conduct was reasonable, and was not an abuse of discretion.

2. *Did the University comply with the course catalog in Nickerson's academic appeal?*

Nickerson next argues that the University did not follow the appeals process in the course catalog after removing Nickerson from both his practicum and the special education program. This argument lacks merit.

The course catalog provides that each student has the right to appeal academic actions. The student must submit a written request for appeal to the dean of the appropriate school within fifteen working days after notification of the action under review. If the action does not involve removal from a major program or loss of baccalaureate degree-seeking status, the student has no further right to appeal within the University, and the dean's decision is the final decision of the University. If the academic action does entail dismissal from a major program or loss of baccalaureate degree-seeking status, the student may appeal the dean's decision to the Vice Chancellor for Academic Affairs within three days. In such cases, the vice chancellor's decision is the final decision of the University, and the student has no further right to appeal within the University. The University complied with these procedures in the instant case.

In notifying Nickerson of the decision to remove him from the practicum, Professor Starlings informed Nickerson that he had the right to appeal, and cited the relevant page of the course catalog outlining those rights. Nickerson, however, did not appeal his removal from his practicum to the dean of the

education department, the appropriate and final forum for that academic appeal. In informing Nickerson of the faculty decision to dismiss Nickerson from the special education endorsement program, Dean McNeill instructed Nickerson that he had the right to appeal the dismissal to the Vice Chancellor of Academic Affairs, and enclosed a highlighted copy· of the appeals process from the course catalog.

Nickerson ultimately sent two letters to Vice Chancellor Roberta Morgan requesting to be reinstated to the practicum, and one letter requesting his reinstatement to the special education endorsement program. In a March 27 meeting with Nickerson, Vice Chancellor Morgan informed Nickerson that his removal from the practicum and his removal from the special education endorsement program were two separate issues, and that she was only empowered to hear the appeal of his dismissal from the special education program. Thus, Nickerson properly appealed his dismissal from the program to Vice Chancellor Morgan. However, although informed by both Professor Starlings and Vice Chancellor Morgan that Dean McNeill was the proper channel for appealing his removal from the practicum, Nickerson never made such an appeal.[2]

The University reasonably complied with the course catalog in Nickerson's academic appeal, and its actions do not constitute an abuse of discretion.

### 3. Was Nickerson denied procedural due process?

With respect to Nickerson's third procedural point, it is a closer question whether Nickerson was denied procedural due process under the Fourteenth Amendment of the United States Constitution and article I, section 7 of the Alaska Constitution.

As a threshold matter, due process rights are only implicated by a deprivation of liberty or property interests.[3] Neither this court nor the United States Supreme Court has specifically held that dismissal from a graduate program constitutes deprivation of a liberty or property interest.[4] Although we have not specifically identified the interest implicated, we have noted that "a school must provide minimal process before suspending or dismissing a student for disciplinary reasons, [but is not required] to provide process when the sanction does not interrupt the student's education."[5] While we do not address the broader issue of whether a student has a property interest in continued enrollment in a graduate program, dismissal from a graduate program for allegedly "hostile," "abrasive," "intimidating," and "unprofessional" behavior sufficiently stigmatizes a person's professional reputation in a chosen career field to constitute an infringement of a liberty interest.

It is a close question whether Nickerson received due process under the Alaska Constitution and the Fourteenth Amendment. In *Horowitz*, the Court distinguished academic dismissals, terminations for deficient scholastic performance, from disciplinary dismissals, terminations for violations of valid rules of conduct.[6] Disciplinary dismissals require oral or written notice of the charges and, although not a formal hearing,

---

**2.** Due to his failure to appeal directly to Dean McNeill, the University argues that Nickerson failed to exhaust his administrative remedies with respect to his removal from the practicum. Although he may not have fully exhausted his administrative remedies, Nickerson's failure to appeal to Dean McNeill may be excused. Dean McNeill participated to some degree in deciding to remove Nickerson from the practicum and in notifying Nickerson of the removal. An appeal to Dean McNeill may be regarded as futile under the circumstances. *See State v. Beard*, 948 P.2d 1376, 1379–80 (Alaska 1997). The superior court concluded that "any failure on the part of Nickerson to exhaust his administrative remedies is excused." Such a determination lies within the sound discretion of the trial court, *Beard*, 948

P.2d at 1380, and we find no abuse of discretion on the record before us.

**3.** *See Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82–84, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978); *Szejner v. University of Alaska*, 944 P.2d 481, 486 (Alaska 1997).

**4.** *See Horowitz*, 435 U.S. at 84–85, 98 S.Ct. 948; *Szejner*, 944 P.2d at 486–87. *But see Harris v. Blake*, 798 F.2d 419, 422 (10th Cir.1986).

**5.** *Szejner*, 944 P.2d at 486 (citation omitted).

**6.** *See Horowitz*, 435 U.S. at 86–91, 98 S.Ct. 948.

an "informal give-and-take" between the student and administrative body which gives the student "the opportunity to characterize his conduct and put it in what he deems the proper context." [7] Academic dismissals require less procedural protection.[8] While the Court never articulated the minimum process required for academic dismissals, the Court indicated that due process is satisfied if (1) the school fully informs the student of its dissatisfaction with his performance and the danger that this deficiency poses to continued enrollment, and (2) the ultimate decision to dismiss is careful and deliberate.[9] No hearing in any form is required for academic dismissals, however.[10]

■ To determine what protections therefore apply, we must first determine whether this case presents an academic or disciplinary dismissal. Although the University regarded the dismissal from the special education program as an academic action, the dismissal was in fact premised largely upon improper conduct, i.e., Nickerson's insubordination and inability to interact effectively with his host teachers and faculty. We observe that the United States Supreme Court itself has characterized suspensions based upon "disruptive and disobedient conduct" as disciplinary proceedings.[11] While acknowledging that there is no clearly identifiable line between academic and disciplinary proceedings, we nevertheless recognize that school teachers must possess the ability to interact effectively with their students and colleagues, and, while less than tangible, such a skill may form an academic requirement necessary for satisfactory completion of a teaching program. Mindful that "the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking," [12]

we accept the University's academic dismissal characterization on this close question.

The next question is whether Nickerson was afforded due process. "Dismissal of a student for academic reasons comports with the requirements of procedural due process if the student had prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and if the decision to dismiss the student was careful and deliberate." [13] Our main concern in this case is whether Nickerson received adequate notice, and we focus on the timing and content of any notice provided Nickerson.

■ We read *Horowitz* as requiring more than mere perfunctory notice rendered with or after the decision to dismiss. Instead, to be meaningful, a student must be given notice prior to the decision to dismiss that the faculty is dissatisfied with his performance and that continued deficiency will result in dismissal. If the University's interests are truly academic rather than disciplinary in nature, its emphasis should be on correcting behavior through faculty suggestion, coercion, and forewarning rather than punishing behavior after the fact. In close cases such as this one where much turns on the academic-disciplinary characterization, a university imposing sanctions for improper conduct cannot avoid the marginally greater protections for disciplinary proceedings, including an informal hearing, by labeling the dismissal academic rather than disciplinary. Although we decline to state a rigid time period by which notice of dissatisfaction and possible dismissal must predate the actual decision to dismiss, we hold that notice must precede the academic dismissal by a reasonable time so that a student has a reasonable opportunity to cure his or her deficient performance.

**7.** *Id.* at 85–86, 98 S.Ct. 948 (quoting *Goss v. Lopez*, 419 U.S. 565, 584, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)).

**8.** *See id.* at 86–87, 98 S.Ct. 948.

**9.** *See id.* at 85.

**10.** *See id.* at 87 n. 3, 90, 98 S.Ct. 948.

**11.** *Compare Goss v. Lopez*, 419 U.S. 565, 569, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) *with Horowitz*, 435 U.S. at 85–86, 98 S.Ct. 948.

**12.** *Horowitz*, 435 U.S. at 90, 98 S.Ct. 948.

**13.** *Schuler v. University of Minnesota*, 788 F.2d 510, 514 (8th Cir.1986) (citing *Horowitz*, 435 U.S. at 85, 98 S.Ct. 948).

██ Given the record before us, we are unable to discern whether Nickerson received adequate notice in this case. At a March 13 meeting with Boquard and Starlings, Nickerson learned that the faculty was dissatisfied with his performance, and he was given some suggestions for remedying the deficiency. The record is unclear, however, as to whether Nickerson was given notice that his continued behavior might result in his dismissal from the special education program. Given the events transpiring within the one-week period from March 15, the day when Professor Starlings received the e-mail from Principal Harlow, to March 22, the day when Dean McNeill notified Nickerson of the faculty decision to dismiss him from the special education program, it is questionable whether the University gave Nickerson proper notice.

On March 15 Principal Harlow informed Professor Starlings that "the picture is a little more grim" than Starlings was led to believe during the March 13 conference. The e-mail implies that Boquard did not fully relay the extent of her dissatisfaction to Nickerson and Starlings on March 13. If Starlings was not fully informed as to the extent of the perceived problem, it seems likely that Nickerson was not sufficiently informed that his practicum was in jeopardy, and most significantly, that his continued enrollment in the program was at risk. In the record currently before us, the first notice regarding potential dismissal from the special education program was the March 20 letter from Professor Starlings confirming Nickerson's removal from the practicum. In that letter, Starlings, apparently for the first time, informed Nickerson that he was going to confer with the special education faculty on the matter, and request a decision on the status of Nickerson's continued enrollment in the special education program. On that same day, March 20, Dean McNeill met with faculty members of the special education program to evaluate Nickerson's status. The committee unanimously voted to remove Nickerson from the program.

Thus, on the current record, it appears that Nickerson was given notice on March 13 that the faculty was dissatisfied with his behavior and performance in the practicum. But it is unclear whether Nickerson was informed that continued misbehavior might result in his dismissal from the program. Instead, the record suggests that Nickerson was first notified that his continued enrollment in the program was in jeopardy the same day that faculty decided to dismiss him from the program. If this is correct, Nickerson was not afforded adequate notice prior to his academic dismissal. Given the state of the record, however, we remand for a determination as to whether Nickerson received adequate notice of the possibility of dismissal from the program.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the superior court is REVERSED and the case is REMANDED for further findings consistent with this opinion. Given this decision, the award of attorney's fees is VACATED.