*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| QWYNTEN RICHARDS, | ) | |
| | ) | Supreme Court No. S-15245 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-10-01246 CI |
| v. | ) | |
| | ) | O P I N I O N |
| UNIVERSITY OF ALASKA, | ) | |
| | ) | No. 7090 – March 18, 2016 |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances: Qwynten Richards, pro se, Fairbanks, Appellant. Susan Orlansky, Reeves Amodio LLC, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Fabe, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

STOWERS, Justice.

## I. INTRODUCTION

After a two-day hearing, the University of Alaska Fairbanks (UAF) dismissed Qwynten Richards from her Ph.D. program for failing to respond to feedback from her professors in a variety of settings. An Appeals Committee at UAF affirmed Richards's dismissal from the program because it concluded that there were sufficient negative reviews from her professors to support her dismissal and that she had failed to satisfactorily complete a "remediation" assignment given to her after the faculty found

she plagiarized parts of a paper. Richards appealed to the superior court. The court affirmed, holding that UAF was reasonable in characterizing her dismissal as academic, that it substantially complied with its procedures, and that Richards received due process. It also awarded UAF 10% of its claimed attorney's fees. Richards appeals, and we affirm.

## II.  FACTS AND PROCEEDINGS

### A.  Facts And Administrative Proceedings

Qwynten Richards began attending UAF for a Ph.D. program in Clinical-Community Psychology in the fall of 2007. In her year-end review for the 2007-2008 academic year, Richards received a satisfactory review. The review was generally positive, but it also noted a few areas of concern, namely that Richards was quiet in class but this was improving, that she was too critical of the Diagnostic and Statistical Manual (DSM), and that her instructors noted that she had difficulty accepting feedback.

Immediately following this review, Dr. Christiane Brems, a professor for one of Richards's courses, brought a possible incident of plagiarism to the attention of the co-teacher of the course, Dr. James Allen. Dr. Allen alerted Don Foley, the Associate Vice Chancellor of Student Life and Director of Judicial Services, to the incident, and Dr. Allen requested that he, Dr. Brems, Foley, and Richards meet to discuss the issue. Drs. Allen and Brems were also the Directors of Clinical Training for the program. They notified Richards and directed her to attend a meeting to discuss the allegations. They informed Richards of the specific paper in question: the integrated paper she had submitted in fulfillment of the course requirements of Psychology 601, a seminar in "Clinical/Community/Cross-Cultural Integration." They also notified her of the provisions of the University of Alaska Student Code of Conduct ("Student Code of Conduct") prohibiting plagiarism. Richards denied the plagiarism allegation.

Dr. Brems, Dr. Allen, Foley, and Richards met on May 28, 2008. At that meeting Richards was "advised sections of the [integration] paper [she] submitted appeared to have been plagiarized." She was "given the opportunity to present [her] views on the situation." After the meeting Richards emailed Dr. Allen, Dr. Brems, and Foley and said that she was glad she had been given the chance to explain that she had satisfactorily cited all of her sources in the paper.

On June 19 the core faculty of Richards's program met in an executive session without Richards to discuss the situation. At this meeting the faculty "unanimously concluded [that Richards's] writing constituted plagiarism," defining plagiarism as "presenting as [one's] own the ideas or works of another person without proper acknowledgment of sources." They gave Richards a new annual review that changed her performance to unsatisfactory, stated that she would receive an F for the paper and a grade of Not Passing (NP) for the course, and that she would be required to write a remediation paper on "how and why [her] Integration paper was judged to have been plagiarized." The faculty decision also noted that she "should know that [she has] the right to appeal academic decisions" and that she should "refer to the Academics and Regulations, Appeal of Academic Decisions section of the 2008-2009 UAF catalog." Richards did not appeal this decision. The updated review also warned that "[a]ny breach of these expectations can result in non-continuation in the Ph.D. Program in Clinical-Community Psychology."

Richards submitted her remediation paper for faculty review. In January 2009 Dr. William Connor, UAF Director of Clinical Training, and Dr. Brems notified Richards that the core Ph.D. faculty had concluded that her remediation paper did not meet the assignment requirements because it did not demonstrate "an understanding of how and why [the] paper was judged to have been plagiarized," and it "did not show an acknowledgment that there is an agreed upon standard with regard to crediting

authorship that has been established by and used in the profession of psychology." While the document did not contain appeal language, the faculty did conduct an informal reconsideration of their decision at Richards's request.

Richards's inability to accept feedback was not limited to problems with her remediation paper. Many other professors noted these issues in a variety of settings. For instance, the professor for whom Richards served as a research assistant asked her to resign. The professor stated that Richards's "future success is in part contingent on [her] ability to accept and be responsive to feedback" and that Richards's "inability to do so contributed to [the professor's] decision to ask her to resign."

Richards also engaged in a clinical practicum with Dr. Michael Hopper. Dr. Hopper noted that Richards was "quick to question and doubt the judgement and experience of others." At her final review in May 2009, Dr. Hopper wrote that Richards's

> inability to accept constructive criticism in supervision and to explore personal issues . . . led to serious impasses with this supervisor and to a suspension of her right to practice briefly in the clinic. In the end I found supervision to have been extremely difficult with [Richards] as she does not seem to understand the role of a trainee and insists on a position of equality and personal competence which she has not yet earned.

He concluded that although her work with clients was "commendable," Richards "did not earn [his] confidence in her abilities and [he] do[es not] recommend her at this point for continued clinical training until she is able to resolve the issues that have plagued her training to this point."[1]

---

[1] The superior court found that, given the tone of the comments, Dr. Hopper meant to write "do not recommend" rather than "do recommend." Richards does not dispute this finding on appeal.

In April, just prior to Dr. Hopper's review, the full Ph.D. faculty met at its annual student review meeting and unanimously recommended not continuing Richards in the program. On June 11 the faculty sent Richards a letter stating that "[d]ue to the fact[] that [she had] received two years of negative evaluations, and that the core faculty in the Ph.D. program ha[d] lost faith in [her] ability to receive and respond to professional feedback in academic, clinical and research settings, the faculty recommends that [she] resign" from the Ph.D. program. The faculty informed her that she had "three weeks to either respond to this recommendation or resign" and that if she chose not to resign, "the next steps outlined in the 'Student Impairment and Incompetence Policy' as listed in the current Ph.D. Student Handbook [the 'Handbook'] . . . [would] be followed." Specifically, the faculty informed her that if she chose not to resign, the Governance Committee would hold a hearing to determine whether to dismiss her from the program.

Richards chose not to resign. Instead, she submitted voluminous materials to the Governance Committee detailing high marks and documenting favorable reviews from her professors. The faculty transmitted a memo to the Governance Committee outlining the steps it had taken and its reasons for recommending Richards's dismissal. The Governance Committee held a hearing on September 3-4. Richards did not present any witnesses, but she did testify on both days of the hearing. Richards did not exercise her option to have an attorney present, but she did have a student representative attend with her.

On September 17, UAF sent Richards a letter notifying her that the Governance Committee had decided to dismiss her from the Ph.D. program. The letter cited Richards's two semesters of not-in-good-standing status, her failure to satisfactorily complete the remediation assignment, and her failure to "accept or act upon feedback in clinical and research settings." The letter informed Richards that she had "10 days from

the receipt of this letter to appeal this decision in writing to UAF Provost Susan Henrichs."

Richards first informally appealed the decision in a meeting on October 6 with Lawrence Duffy (the Interim Dean), Laura Bender (the Director of the Graduate School), and Dr. Abel Bult-Ito (a professor who had become an advocate for Richards). The Dean noted that Richards's detailed appeal

> mainly addresse[d] [her] disagreement with the professionals who worked with [her] and gave [her] grades . . . . In this informal appeal, [his] decision remain[ed] unchanged in that [he placed] greater weight on the professional opinion of the faculty than on [Richards's] opinion of how the program should evaluate students.

He concluded that the "decision remain[ed] unchanged," and he advised Richards of her right to appeal to UAF Provost Henrichs.

Richards formally appealed the decision to the Provost on October 31. The Appeals Committee met on December 3 and issued a decision on December 10. The decision stated that the Appeals Committee had "reviewed all of the documentation submitted[] and engaged in lengthy deliberation." The Appeals Committee dismissed Richards's appeal concerning her termination from the Ph.D. program.[2] It determined that the faculty was within its rights to make the decision to dismiss her from the Ph.D. program, that feedback was vital in psychology, and that even if a student disagreed with feedback "it is critical in a program requiring professional licensure that students comply with professional requests and advice." But the Appeals Committee determined that Richards could apply to other programs in the graduate school through the normal application process. Richards appealed this decision to the superior court.

---

[2]     The Appeals Committee used the term "dismissed" in the sense that it denied or rejected Richards's appellate arguments, thereby upholding the Governance Committee's decision to dismiss her from the Ph.D. program.

**B. Superior Court Proceedings**

The superior court affirmed Richards's dismissal from the Ph.D. program at UAF. First, it concluded that it was not arbitrary, unreasonable, or an abuse of discretion for UAF to characterize Richards's dismissal as academic, rather than disciplinary.[3] It further noted that the reasons Richards had been dismissed — failure to accept feedback from her professors throughout her time in the program, particularly as a research assistant and in her clinical practicum, and failure to demonstrate an understanding of why her paper constituted plagiarism — were academic reasons in light of *Nickerson v. University of Alaska Anchorage*, where Nickerson's academic dismissal was for "hostile, abrasive, intimidating, and unprofessional behavior."[4] Second, it concluded that UAF substantially complied with its policies relating to academic violations as laid out in the Handbook. Finally, it held that Richards received ample due process because UAF provided her with notice, multiple opportunities to be heard, careful deliberation, and independent review.

UAF asked for 50% of its attorney's fees, roughly $25,000, because Richards's "long and complex briefing" resulted in substantial extra expenses. Richards argued that requiring her to pay any attorney's fees was improper because she was a constitutional litigant and did not have a monetary interest in the case. The court concluded that Richards was not a constitutional claimant and determined that an award of 20% of UAF's fees would be appropriate under Alaska Rule of Civil Procedure 82(b)(2). However, the court also worried about chilling future claims and therefore awarded only 10% of UAF's claimed attorney's fees.

---

[3] The university procedures and the level of due process that our precedent requires differ for academic proceedings and disciplinary proceedings. *See Nickerson v. Univ. of Alaska Anchorage*, 975 P.2d 46, 52-54 (Alaska 1999).

[4] *Id*. at 52.

Richards appeals. In this appeal, we address three central issues: (1) whether the appeal was academic or disciplinary; (2) whether UAF substantially complied with its procedures and whether evidence in the record supported its decision; and (3) whether Richards received due process. We will also discuss the superior court's award of attorney's fees.

## III. STANDARD OF REVIEW

"In administrative appeals, we directly review the agency action in question."[5] We review questions of fact for substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[6] "We need only determine whether such evidence exists, and do not choose between competing inferences."[7]

We will not override a school's academic decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."[8] We review whether the school complied with its policies under the "arbitrary, unreasonable, or . . . abuse of discretion" standard.[9] Questions of law that require agency expertise are

---

[5]     *Brown v. Pers. Bd. for City of Kenai*, 327 P.3d 871, 874 (Alaska 2014) (quoting *Grimmett v. Univ. of Alaska*, 303 P.3d 482, 487 (Alaska 2013)).

[6]     *Id.* (quoting *Grimmett*, 303 P.3d at 487).

[7]     *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

[8]     *Bruner v. Petersen*, 944 P.2d 43, 48 (Alaska 1997) (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).

[9]     *Nickerson*, 975 P.2d at 50 n.1 (quoting *Szejner v. Univ. of Alaska*, 944 P.2d 481, 484 n.2 (Alaska 1997)).

reviewed under the "reasonable basis" standard.[10]

Whether "the University procedures comported with due process involve[s] a question of law not requiring agency expertise."[11] Thus, we review this question using our independent judgment.[12]

We review an attorney's fees award for an abuse of discretion and will reverse when "the award is arbitrary, capricious, manifestly unreasonable, or improperly motivated."[13]

## IV.    DISCUSSION[14]

---

[10]    *May v. State, Commercial Fisheries Entry Comm'n*, 175 P.3d 1211, 1215-16 (Alaska 2007).

[11]    *Nickerson*, 975 P.2d at 50 n.1.

[12]    *Id.*

[13]    *Rhodes v. Erion*, 189 P.3d 1051, 1053 (Alaska 2008) (quoting *Kellis v. Crites*, 20 P.3d 1112, 1113 (Alaska 2001)).

[14]    We are able to dispose of several of Richards's arguments in summary fashion.  (1) Richards argues that she did not plagiarize her paper, that no finding of plagiarism was ever made, and that no one identified the problematic portions of the paper.  However, the record clearly establishes that the faculty unanimously concluded that Richards's writing constituted plagiarism.  Furthermore, the issues discussed with Richards during the May 2008 meeting and Richards's email discussing how she had responded to the allegations by showing that sources were correctly cited reveal that Richards knew which portions of the paper were in question.

(2) Richards does not dispute that she did not appeal the plagiarism decision even though she had the right to do so and was informed of this right.  However, Richards argues that an appeal would have been futile because the allegation was unfounded, she was not threatened with dismissal at the time, her accusers would be the decision-makers on appeal, she had no advisor to advise her, and she was experiencing family issues.  Contrary to her assertion, the amended review clearly states that dismissal was a possibility.  Secondly, the appeals policy provides for an informal appeal with the decision maker followed by a formal appeal to the Provost, a person outside Richards's

(continued...)

-9-                                  7090

## A. UAF Acted Reasonably When It Characterized The Dismissal As An Academic Dismissal.

Richards contends that UAF arbitrarily characterized her dismissal as academic when the dismissal was actually disciplinary. Richards focuses her argument on the facts that (1) the Student Code of Conduct defines plagiarism as a disciplinary infraction; (2) Foley, the Director of Judicial Services, initiated the plagiarism allegation; (3) the initial notice of the plagiarism allegation directed her to the Student Code of Conduct plagiarism section and disciplinary policy 09:02, not the Handbook; and (4) plagiarism proceedings are disciplinary because plagiarism allegations imply dishonesty.

*Nickerson* presented a similar question. Nickerson was enrolled in the University of Alaska Anchorage's Teacher Certification Program, and he was dismissed

---

[14](...continued)

core faculty. The Appeals Committee also did not include her accusers. Moreover, her family issues and the lack of advisor do not make the appeal futile under Alaska case law, and her belief that the allegations were unfounded should have caused her to appeal. *See, e.g.*, *Nickerson*, 975 P.2d at 52 n.2; *State, Dep't of Revenue v. Hernandez*, No. S-10745, 2004 WL 1092334, at *6 (Alaska May 12, 2004) (holding that appeal was futile when the State already refused to address issue).

(3) Richards makes many factual assertions, both about facts the superior court found and facts that did not impact the decisions of the University and the superior court. Richards alleges that Dr. Allen was the one who accused her of plagiarism and that all of the negative reviews in the 2008 evaluation were from one sexist professor. These factual allegations are unsupported.

(4) Finally, Richards argues that being forced to write the remediation paper violated her right against self-incrimination and that by having one informal meeting and then a second executive meeting of the faculty regarding the plagiarism issue, UAF put her in double jeopardy. But the right against double jeopardy does not apply outside the criminal context, absent extreme circumstances not present here. *Hudson v. U.S.*, 522 U.S. 93, 98-99 (1997). *See also Doe v. State*, 189 P.3d 999, 1007 & n.58 (Alaska 2008). And although the right against self-incrimination applies in "any 'proceeding, civil or criminal, formal or informal, where the answers might incriminate [the party] in future criminal proceedings," plagiarism is not a crime. *Armstrong v. Tanaka*, 228 P.3d 79, 82 (Alaska 2010). *See also Lawson v. Lawson*, 108 P.3d 883, 887 (Alaska 2005).

based on his failure to respond to feedback and his hostile behavior towards professors and colleagues.[15] UAA characterized Nickerson's dismissal as an academic, not disciplinary, dismissal.[16] We acknowledged that this issue was a close call and accepted the University's decision because "the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking."[17]

Richards contends that she "experienced allegations . . . that were . . . very similar to those made against Nickerson." But Richards appears, as a whole, to argue that she was dismissed because she plagiarized her paper. However, the record does not support a finding that UAF dismissed Richards for plagiarism. Rather, she was dismissed principally because she could not appropriately accept feedback in all settings, including in her research assistantship and clinical practicum, during which she was unwilling to accept constructive criticism and was quick to doubt the judgment and experience of others. These problems escalated to the point that Richards was asked to resign from her research assistant position and was suspended from her clinical practicum. In dismissing Richards, UAF also relied on the facts that she had not completed the remediation assignment to satisfactory standards, and she had not been in good standing for two semesters.

Although plagiarism is listed in the Student Code of Conduct as a disciplinary infraction, the conduct for which Richards was actually dismissed fits into the Handbook's "Academic Impairment" section. This section lists, as examples of

---

[15] *Nickerson*, 975 P.2d at 48-49.

[16] *Id.* at 52-53.

[17] *Id.* at 53 (quoting *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 90 (1978)).

conduct that may constitute academic impairment, an "inadequate level of self-directed professional development" and "inappropriate use of and/or response to supervision or academic guidance."

Richards also claims that the dismissal must have been disciplinary because Foley was involved from the beginning, and Richards was initially directed to the Student Code of Conduct. These arguments do not have merit. When examining UAF's course of conduct as a whole, the weight of the evidence makes clear that UAF consistently used academic procedures after the very beginning of the proceedings. Not only did UAF's initial plagiarism-related decision clearly state that Richards could appeal the "academic decision[]," but UAF also followed the steps laid out in the Handbook for academic issues [*See* Section B, *infra*], and UAF's General Counsel discussed the issue as being academic in internal emails. To place too much weight on UAF's preliminary initiation of procedures before either party had all relevant information when determining whether an issue is academic or disciplinary would severely hamper UAF's ability to correctly classify proceedings as academic or disciplinary.

We conclude, based on our holding in *Nickerson*, that UAF acted reasonably when it classified Richards's dismissal for failure to follow feedback as an academic dismissal.

B.   **UAF Substantially Followed Its Legally Valid Procedures, And The Dismissal Was Not Arbitrary Or Capricious.**

Richards argues (1) that UAF should not have applied the Handbook procedures[18] and (2) that UAF did not comply with those procedures.

---

[18]   A few of Richards's arguments in this section of her brief relate back to the disciplinary versus academic dichotomy. For example, she argues that the May 2008 meeting with Dr. Brems, Dr. Allen, and Foley was not "informal" — and therefore
(continued...)

She also takes issue with the substance of the Handbook procedures as they relate to due process considerations.[19]

### 1. It was not arbitrary or capricious to apply the procedures in the program Handbook.

UAF has several sets of governance rules: Regents' policies, university regulations, faculty senate policies, and the program Handbook. Regents' policies include a very broad statement that if a student is dismissed for academic reasons, the challenge is to be reviewed in accordance with procedures set forth in university regulations and the Major Academic Unit's rules and procedures.[20] The university regulation for academic dismissal is more specific and provides that the Major Academic Unit's rules and procedures will set forth formal and informal processes by which a student can obtain review of an academic dismissal from a program of study.[21] It does,

---

[18](...continued) started the disciplinary process — because she was required to be there, the Dean and Provost were copied, and the request was sent on letterhead from Foley, the Director of Judicial Services at UAF. This contention is merely another argument that the procedures were disciplinary, an issue we address above. Even if her argument is that the superior court erred by characterizing this proceeding as informal, she is also incorrect. No witnesses were called; it was not a hearing. It is better characterized as a time when Richards was able to explain her side of the story in an informal setting. The Handbook itself supports this conclusion, noting that Step Five begins the initiation of formal action and suggesting that previous steps are meant to serve as "informal methods at problem resolution."

[19] Richards argues that the Handbook procedures as written do not provide students with due process; we address these arguments in the following section.

[20] Regents' Policy P09.03.024, available at http://www.alaska.edu/bor/policy/09-03.pdf.

[21] University Regulation R09.03.024(C), available at http://www.alaska.edu/bor/policy/09-03.pdf.

however, require that the process include a request for a formal review, review by an academic decision review committee, and a final decision provided to the student in writing.[22] The faculty senate policies include an even more in-depth description of the process.[23] Under these policies, the process begins with the student requesting an informal review of the decision. Afterwards the student may ask for a formal review by a five-member Appeals Committee if the student is dissatisfied with the informal review.[24] At the meeting the Appeals Committee may decide to dismiss[25] the student's request for formal review if the student has failed to provide a sufficient reason that the academic decision was "arbitrary and capricious."[26] If the Appeals Committee decides to accept the appeal, it will schedule a second meeting to review the request.[27] Finally, the program Handbook lists an even more detailed set of mechanisms, especially leading up to the formal appeal.

There is no merit to Richards's argument that the Regents' broad policies should have been applied over the more specific program Handbook. The Regents' policy explicitly provides that the grievance will be reviewed in accordance with the

---

[22]    University Regulation R09.03-024(C)(1)-(5), http://www.alaska.edu/bor/policy/09-03.pdf.

[23]    *See* UAF Governance, Appeals Policy For Academic Decisions, Procedures, https://www.uaf.edu/uafgov/faculty-senate/policies-procedures/appeals-policy-for-academ/.

[24]    *Id.* §§ (A)-(B).

[25]    *See supra* note 2.

[26]    UAF Governance, Appeals Policy For Academic Decisions, Procedures § (B)(3)(d), https://www.uaf.edu/uafgov/faculty-senate/policies-procedures/appeals-policy-for-academ/.

[27]    *Id.* § (B)(4).

Major Academic Unit's policies, and it directs the reader back to the Handbook itself. The Handbook appears to be the most specific set of rules applicable to Richards's program, so it was neither arbitrary nor capricious for UAF to conduct the proceedings according to the Handbook.

### 2. UAF substantially complied with the program Handbook.

In *Nickerson* we held that the University's actions were not an abuse of discretion because they substantially complied with the course catalog.[28] UAF's program Handbook is similar to the course catalog in *Nickerson*.[29] Since UAF substantially complied with the Handbook's published procedures on dismissal, UAF's conduct was not arbitrary, capricious, or an abuse of discretion.[30]

The program Handbook has eight steps. It is a straightforward exercise to relate the turn of events in this case with the step-by-step framework in the Handbook.[31]

---

[28] *Nickerson v. University of Alaska Anchorage*, 975 P.2d 46, 52 (Alaska 1999).

[29] *See id*. at 51 (describing the course catalog as setting out procedures for appeals of academic decisions, including dismissal).

[30] *Id*. at 52.

[31] These steps, in summary, are:

(1) Anyone may bring a complaint against a student to the Directors of Clinical Training. A small group discusses the complaint to decide whether it warrants investigation. Step One occurred when Dr. Allen contacted Dr. Brems and Foley. The three discussed the plagiarism allegation via email and decided to meet with Richards.

(2) The Directors meet with the student. Step Two occurred when Dr. Allen, Dr. Brems, and Foley met with Richards in May 2008. They allowed Richards to provide input, as the step requires.

(3) The full Ph.D. faculty meets for an executive session to make an initial determination about whether to pursue further action under the Handbook. Step Three

(continued...)

occurred when the core Ph.D. faculty met in June 2008. At the meeting the faculty made an initial determination that Richards had plagiarized her paper and decided to give her a remediation assignment. Richards was notified of the faculty's decision at a meeting held in July. She was also notified that she could appeal the decision, which she did not. Instead she wrote the remediation paper. Because she did not appeal the decision to the Governance Committee and the faculty decided not to recommend her dismissal at that time, the remainder of the steps did not apply in 2008. When Richards failed to complete the remediation assignment in 2009, a reasonable reading of the Handbook returned the process to Step Three. When the core faculty met again in April 2009 to discuss Richards's situation, it recommended dismissing Richards from the program, and it sent her a letter asking her to resign.

(4) The student, the student's advisor, and the faculty member making the accusation meet to discuss the matter and, if applicable, discuss a remediation plan. The student may seek an informal resolution during this meeting if the student disagrees with the faculty's decision. This meeting took place on June 11, 2009, and Richards received the memo asking her to resign at that time.

(5) If the problem cannot be resolved informally, the Governance Committee reviews the dispute and decides whether to dismiss the student. Witnesses may testify at this stage, and the student will be given copies of all written materials the Governance Committee is considering. The student may have an attorney present. The Governance Committee met in September 2009 and took testimony from Richards over the course of two days, in satisfaction of Step Five.

(6) The Governance Committee reaches a decision. (This step is mislabeled as Step Five in the Handbook.) The Governance Committee decided on a "formal course of action," dismissing Richards, during Step Six.

(7) The Governance Committee notifies the student in writing of its decision. The student may appeal this decision. (This step is mislabeled as Step Six in the Handbook.) The Governance Committee transmitted its decision to Dean Duffy, who notified Richards of the decision in writing that same day. Step Seven allows the Governance Committee to delegate notification to a third party, so it was proper for Dean Duffy to notify Richards.

(8) If a remediation plan is given, the student and the student's advisor meet to ensure it is completed. If the student fails to complete the remediation assignment, she

After Step Seven, when Dean Duffy notified Richards that the Governance Committee had decided to dismiss her, the procedure moved to UAF's faculty senate regulations, which are reproduced in the Handbook.

The senate regulations require the student to attempt first to resolve the issue informally. Richards informally appealed to Dean Duffy because the department chair, Dr. Allen, was directly involved. Dean Duffy concluded that the decision to dismiss Richards would remain unchanged. As per the regulations, Richards filed a formal appeal with the Provost on October 31, 2009. The Appeals Committee met on December 3.[32] The Appeals Committee dismissed Richards's appeal because it concluded that she did not provide sufficient support for her assertion that the academic decision was arbitrary and capricious.

UAF did a thorough job of following its internal policies and regulations; therefore we conclude that UAF did not act in an arbitrary or capricious manner in dismissing Richards from the program.[33]

---

[31](...continued) may be dismissed from the program. (This step is mislabeled as Step Seven in the Handbook.)

[32]     Richards argued before the superior court, but does not now argue, that the Appeals Committee met outside of the mandated ten-day period. The superior court's reasoning on this issue is persuasive: that the regulation requires the Appeals Committee to set a date within ten days of receiving the appeal. But even if the regulation required the meeting to be held within ten days, Richards has not shown she was prejudiced by this mistake, and UAF substantially complied with its regulations overall, even when considering this deficiency.

[33]     Richards points to the substantial amount of coursework she submitted in the administrative proceedings demonstrating favorable comments as evidence of her positive academic performance. But there was also substantial evidence that she refused to accept feedback, both in classes and on the plagiarism issue. The fact that Richards

(continued...)

**C.  The Superior Court Did Not Err In Holding That Richards Received Due Process.**

Neither we "nor the United States Supreme Court has specifically held that dismissal from a graduate program constitutes deprivation of a liberty or property interest."[34] But "a school must provide minimal process before suspending or dismissing a student for disciplinary reasons."[35] We have adopted the United States Supreme Court's approach that such due process is satisfied if "(1) the school fully informs the student of its dissatisfaction with [her] performance and the danger that this deficiency poses to continued enrollment, and (2) the ultimate decision to dismiss is careful and deliberate."[36] The level of due process required for an academic dismissal would be less than the minimal due process required for a disciplinary dismissal.[37]

**1.  Amount of process required**

Richards argues that because of the stigmatizing nature of the allegations against her — failure to accept feedback and (she contends) plagiarism — she should receive more due process than required in *Nickerson*. She interprets *Nickerson* as dissolving the distinction between academic and disciplinary dismissals, entitling her to disciplinary due process protections. Neither of these arguments has merit. The

---

[33](...continued)
had other, more favorable comments on her work does not make UAF's decision arbitrary or capricious.

[34]     *Nickerson*, 975 P.2d at 52.

[35]     *Id.* at 52 (quoting *Szejner v. Univ. of Alaska*, 944 P.2d 481, 486 (Alaska 1997)).

[36]     *Id.* at 53 (citing *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85 (1978)).

[37]     *Id.* at 52-53.

allegations in *Nickerson* — "hostile," "abrasive," "intimidating," and "unprofessional" behavior while teaching — are just as stigmatizing as the allegations against Richards — her inability to accept feedback in various situations and her failure to satisfactorily complete her remediation assignment. And her argument that *Nickerson* dissolved the distinction between academic and disciplinary due process does not follow from a reading of the case. In *Nickerson* we repeatedly cited to the distinction between academic and disciplinary process, at one point stating that "a university imposing sanctions for improper conduct cannot avoid the marginally greater protections for disciplinary proceedings, including an informal hearing, by labeling the dismissal academic rather than disciplinary."[38] Moreover, the difference in these two procedures was the basis for our discussion in *Nickerson* of whether the dismissal was academic or disciplinary.[39]

Nothing in Richards's arguments provides a reason to depart from the standard in *Nickerson* that "[d]ismissal of a student for academic reasons comports with the requirements of procedural due process if the student had prior notice of faculty dissatisfaction with his or her performance and of the possibility of dismissal, and if the decision to dismiss the student was careful and deliberate."[40]

### 2.   Bias by decision makers

To meet any due process standard the decision makers must not have been biased, so we next address Richards's accusations of bias.[41] First, Richards argues that

---

[38]   *Id*. at 53.

[39]   *Id.*

[40]   *Id.* (quoting *Schuler v. Univ. of Minn.*, 788 F.2d 510, 514 (8th Cir. 1986)).

[41]   *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (holding that a biased
(continued...)

Dr. Allen was biased against her because she reported an incident of sexism by another professor to him. Not only is evidence related to the allegation of sexism not present in the record, but the professor in question was not a member of either the Governance Committee or the Appeals Committee. Nor was Dr. Allen on the Governance Committee or the Appeals Committee.

Richards's other arguments relating to bias center on the Governance Committee hearing and the Appeals Committee meeting. She argues that Michael O'Brien, UAF's General Counsel, had an undue influence on the Appeal Committee proceedings. And she argues that there were no independent reviews of her dismissal because the Governance Committee was made up of accusing parties. She also alleges that the materials she submitted to the Governance Committee were tampered with. Finally, she argues that Dean Duffy was biased because he signed her dismissal on the same day he received it.

"Administrative agency personnel are presumed to be honest and impartial until a party shows actual bias or prejudgment."[42] Richards provides no actual evidence supporting her allegations. She argues that it has not been proved that O'Brien did not participate in the Appeals Committee decision, but this argument is insufficient: argument is not evidence. And neither of the accusing parties, Dr. Allen and Dr. Brems, were voting members of the Governance Committee or the Appeals Committee. Finally, other than her bare allegation, there is no evidence that the materials she submitted to the Governance Committee were tampered with. Her argument that Dean Duffy was biased because he signed the Governance Committee decision the same day he received it fails

---

[41](...continued) decisionmaker renders an administrative proceeding unconstitutional).

[42]     *AT & T Alascom v. Orchitt*, 161 P.3d 1232, 1246 (Alaska 2007).

because the Handbook makes clear that he was transmitting the decision rather than independently reviewing it.

In short, Richards offers no evidence that would rebut the presumption that administrative agency employees are presumed to be honest and impartial. Bias does not present a basis for us to conclude that UAF denied Richards due process.

### 3. Due process standard under *Nickerson*

Under *Nickerson*, Richards only needed to receive "prior notice of faculty dissatisfaction with . . . her performance and of the possibility of dismissal" and a decision that was "careful and deliberate."[43] Generally, the Handbook satisfies these due process requirements and affords students adequate due process. The Handbook requires written notice "[w]hen a student is placed on not-in-good-standing status" and cautions that if a student does not "return to good academic standing by the end of the two semesters following placement on not-in-good-standing [status], the student may be dismissed from the program." The Handbook also explicitly requires notification to the student in Steps Four and Six. Furthermore, the Handbook's requirements help ensure that decisions made under Handbook procedures, including dismissal decisions, are "careful and deliberate." The Handbook provides for multiple meetings between interested parties, including a preliminary discussion of the complaint in Step One and meetings with the student in Steps Two and Four, as well as numerous opportunities for deliberation, including a discussion among the core faculty in Step Three, an evaluation by the Governance Committee in Step Five, and a review of the remediation plan in Step Eight.

The superior court correctly noted that UAF went far beyond what due process required when it dismissed Richards. Nonetheless, Richards raises many

---

[43] *Nickerson*, 975 P.2d 46, 53 (Alaska 1999) (quoting *Schuler*, 788 F.2d at 514).

arguments on appeal.[44]  The argument that goes to the heart of her due process concerns is her argument that she did not receive proper notice of her dismissal.  Richards contends that the provisions in the Handbook warning of dismissal for failure to remediate and continued not-in-good-standing status cannot be considered proper notice.

"[N]otice must precede the academic dismissal by a reasonable time so that a student has a reasonable opportunity to cure his or her deficient performance."[45]  "[T]o be meaningful, a student must be given notice prior to the decision to dismiss that the faculty is dissatisfied with [her] performance and that continued deficiency will result in

---

[44]  Many of Richards's arguments related to this claim can be quickly dismissed as factually inaccurate or unhelpful.  (1) She argues that she was denied due process because she did not have a lawyer or advisor present at the Governance Committee meeting under Step Five of the Handbook.  However, due process does not require an attorney to be present.  *See Nickerson*, 975 P.2d at 53 (holding that a hearing is not required and not mentioning any right to representation for academic dismissals).  Nevertheless, the Handbook allows an attorney to be present, but Richards chose not to have an attorney at this stage, even though she did have an attorney earlier in the administrative proceedings.  Although she did not choose to have an attorney present, Richards did have a student representative on the appeals committee. (2) She alleges that she was not allowed to present her materials to the Appeals Committee.  However, the Appeals Committee thoroughly reviewed all of the materials that Richards submitted.  (3) She argues that she should have been present at the executive faculty meeting where the faculty found that she plagiarized the integration paper.  Under the Handbook this meeting was a closed executive meeting.  Furthermore, due process does not even require a hearing, so it is certainly not necessary for UAF to permit Richards to attend the executive meeting.  *See Nickerson*, 975 P.2d at 53.  (4) Richards also makes the argument that the Handbook she received was in draft form and that later changes to the procedures indicate that UAF knew that the draft procedures were constitutionally flawed.  But the Handbook being in draft form is insufficient for us to conclude that there were constitutional errors in it.

[45]  *Nickerson*, 975 P.2d at 53.

-22-                                                                                    7090

dismissal."[46]

Richards was given repeated notice that there were issues with her inability to accept feedback and regarding her not-in-good-standing status. Her initial 2008 review detailed her problems accepting feedback in many situations, not just with regards to her integration paper, and the faculty clearly informed her that her remediation paper did not show that she understood why her integration paper was plagiarized. The professor for whom Richards was a research assistant asked her to resign, citing her difficulties accepting and responding to feedback. And Richards's supervisor for her clinical practicum also stated that she did not accept feedback well, which "led to serious impasses" resulting in a suspension of her right to practice in the clinic. Richards was informed that she was not in good standing both in 2008 when she received her updated annual report and in January 2009 when the faculty deemed her remediation paper insufficient. Although Richards received some positive comments in the 2008 annual review, the positive messages do not outweigh the faculty's increasingly negative reports to her, especially at the time her remediation paper was rejected, when she was terminated from her research assistantship, and when she was continued in not-in-good-standing status.

Given the evidence above, Richards received sufficient notice that there were serious concerns about her ability to accept feedback in academic and professional settings. By the time of the Committee's final decision to dismiss her in September 2009, she had notice of several specific examples detailing her inability to receive feedback, including the rejection of her remediation paper, the continuation of her not-in-good-standing status, and her dismissal from her research assistantship.

Secondly, Richards was given sufficient notice that continuation on her

---

[46]    *Id.*

current course would result in dismissal.[47]  Although Richards was not directed to the Handbook during the 2008 annual review, she was directed there in the 2009 dismissal recommendation.  And she was informed of her tenuous status in the 2008 amended review when the review stated that she was "expected to reflect . . . professionalism in conduct, and compliance with the APA Ethical Code and the UA Student Code of Conduct.  Any breach of these expectations can result in non-continuation in the Ph.D. Program."  The review also included the statement, "A review will be conducted at the Annual Student Professional Development Review in Spring 2009, at which time a determination about your standing as a graduate student will be made."  These statements were each repeated once more in the review.  The program Handbook also served as notice, alerting Richards that more than two semesters of not-in-good-standing status as well as any violations of the APA Ethical Guidelines could result in dismissal from the program.[48]  The Handbook listed "inappropriate . . . response to supervision or academic guidance" and "inadequate level[s] of self-directed development" as examples of academic impairment.  One indicator of an academic impairment warranting more severe intervention is if "[t]he student's behavior does not change as a function of feedback, remediation efforts, and/or time."  Additionally, the Handbook states that "[i]f remediation is not successful, student dismissal may be necessary."

Furthermore, the record reflects the abundance of careful deliberation that occurred before UAF faculty terminated Richards from the program, including multiple

---

[47]  *Id.* ("[T]o be meaningful, a student must be given notice prior to the decision to dismiss that the faculty is dissatisfied with [her] performance and that continued deficiency will result in dismissal.").

[48]  In *Hermosillo v. Univ. of Alaska Anchorage*, No. S-10563, 2004 WL 362384, at *5 (Alaska Feb. 25, 2004), we adopted the opinion of the superior court, which held the appellant "should have known that readmission to the course would be discretionary based on the BSW Student Handbook."

meetings with Richards, two group meetings of faculty, and a two-day hearing where Richards testified and the faculty reviewed the voluminous evidence she submitted.

Under our standard in *Nickerson*, we hold that Richards received appropriate levels of due process.[49]

**D.    The Superior Court Did Not Abuse Its Discretion In Its Award Of Attorney's Fees.**

Under AS 09.60.010(c) the court

> may not order a claimant to pay the attorney fees of the opposing party devoted to claims concerning constitutional rights if the claimant as plaintiff, counterclaimant, cross claimant, or third-party plaintiff in the action or appeal did not prevail in asserting the right, the action or appeal asserting the right was not frivolous, and the claimant did not have sufficient economic incentive to bring the action or appeal regardless of the constitutional claims involved.

The superior court concluded that Richards was not a constitutional claimant because she had an economic interest in the outcome of the case. But the court was worried about chilling future claimants and awarded $5,021, only 10% of UAF's claimed attorney's fees. We conclude that the superior court did not abuse its discretion in this award.

Richards had a more than sufficient economic incentive to bring the suit. As she states in her brief, she had two years of coursework invested in the Ph.D. program, and the opportunity to pursue a Ph.D. is an economic interest.[50]    Richards

---

[49]    *Nickerson*, 975 P.2d at 53.

[50]    *Alaska Conservation Found. v. Pebble Ltd. P'ship*, 350 P.3d 273, 282 (Alaska 2015) ("A litigant has sufficient economic incentive to bring a claim when it is brought primarily to advance the litigant's direct economic interest, regardless of the nature of the claim."). Richards also claims damages, which lessens the likelihood that her claim is constitutional. *See Ninilchik Traditional Council v. Noah*, 928 P.2d 1206, 1219 (Alaska 1996) ("[T]he parties here have made no claim for monetary damages,

(continued...)

additionally bases her claim to constitutional-litigant status on her belief that her due process allegations make her a constitutional claimant such that the court may not require her to pay UAF's attorney's fees.[51]  Richards is mistaken.  Although Richards does assert a constitutional right, she had "sufficient economic incentive to bring the action . . . regardless of the constitutional claim[] involved."[52]  The court therefore retained the discretion to award attorney's fees to UAF.

Second, UAF is correct that the award of attorney's fees falls under Alaska Rule of Appellate Procedure 508(e), not Alaska Rule of Civil Procedure 82.[53]  Appellate Rule 508(e) has been changed substantially since the superior court's fee decision,[54] but at the time the superior court made its decision, it read:

> Attorney's fees may be allowed in an amount to be determined by the court . . . .  If the court determines that an appeal or cross-appeal is frivolous or that it has been brought simply for purposes of delay, actual attorney's fees may be awarded to the appellee or cross-appellee.

The superior court had substantial discretion under this section to award fees, and in this case it only awarded 10% of the attorney's fees even though UAF asked it to award 50%.  The superior court was within its discretion to consider the chilling

---

[50](...continued) indicating that economic motivation was not a significant factor in bringing the claim.").

[51]     AS 09.60.010(c) addresses attorney's fees as they relate to constitutional claimants.

[52]     AS 09.60.010(c).

[53]     *See Stalnaker v. Williams*, 960 P.2d 590, 597 (Alaska 1998) ("A superior court hearing an appeal from an administrative agency awards attorney's fees under Appellate Rule 508, not Civil Rule 82.").

[54]     *See* Alaska Supreme Court Order No. 1843 (April 15, 2015).

effect a higher award could have on future students and reduce the award accordingly. And we have upheld an even higher award percentage-wise in a past academic case.[55]

We hold that the superior court did not err by concluding that Richards was not a constitutional claimant and did not abuse its discretion in awarding 10% of UAF's attorney's fees.

## V.    CONCLUSION

We AFFIRM the superior court's decision upholding UAF's administrative decision dismissing Richards from her Ph.D. program.

---

[55]    *Hunt v. Univ. of Alaska, Fairbanks*, 52 P.3d 739, 746 (Alaska 2002) (upholding approximate 20% award).