SOUTH ANCHORAGE CONCERNED
COALITION, INC., Appellant,

v.

MUNICIPALITY OF ANCHORAGE
BOARD OF ADJUSTMENT, David D.
Hultquist and Lesa L. Hultquist, Appel-
lees.

No. S–12121.

Supreme Court of Alaska.

Dec. 14, 2007.

---

**29.** Our disposition of this issue makes it unneces-
sary to address other issues raised by the Coali-
tion.

Lawrence V. Albert, Anchorage, for Appellant.

Joshua M. Freeman, Assistant Municipal Attorney, and James N. Reeves, Municipal Attorney, for Appellee Municipality of Anchorage.

Donald W. McClintock and Dani Crosby, Ashburn & Mason, P.C., Anchorage, for Appellees Hultquist.

Before: FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

PER CURIAM.

## I. INTRODUCTION

This appeal arises from opposition to a proposed residential development on a former gravel pit in south Anchorage. Approval of the development by the municipal planning authority was contingent on submission of evidence indicating that local groundwater supplies would not be contaminated by the development. Evidence to that effect was submitted by the developers and the plats were approved. The South Anchorage Concerned Coalition contests the integrity of that evidence generally and whether the agency was justified in relying on it to satisfy requirements that it pursue further investigation before the plat could be approved. Specifically at issue in this appeal are (1) whether the superior court abused its discretion in refusing to apply the de novo standard of review to the agency's approval of a development plat; (2) whether the court erred in refusing to allow the Coalition to supplement the record on appeal; and (3) whether the agency abused its discretion in approving the plat in reliance on the data and reports submitted by the developers.

## II. FACTS AND PROCEEDINGS

In December 2001 David and Lesa Hultquist submitted a plat application to the Mu-

nicipality of Anchorage Platting Board to develop a 233–acre residential subdivision in an area known as the Sand Lake Gravel Pits. Gravel had been excavated at the site since the 1950s, significantly altering its natural topography: the terrain is variable and uneven, and a majority of the site is fifty feet lower than the surrounding landscape. Additionally, excavation in one area exceeded the depth of the groundwater table, exposing an aquifer "pond." Local residents served by wells (which tap into aquifers) became concerned that development of the area would contaminate the underlying groundwater supply. The South Anchorage Concerned Coalition (the Coalition) represented those residents opposed to the development throughout the platting process.

In support of their plat application, the Hultquists submitted two reports prepared by their environmental consultant, Terrasat, Inc., which concluded that the proposed development would not significantly impact the area's groundwater supplies. A public hearing on the application was scheduled for March 2002. In advance of that hearing, municipal staff indicated that the report was inadequate in several respects; they advised the Hultquists to conduct further investigation to "better define the characteristics" of the aquifers underlying the development area prior to the hearing.

The Platting Board approved the plat at the March hearing, subject to numerous conditions, many of which were specific to better understanding and protecting the site's groundwater resources. Among these, Condition No. 31 required that the Hultquists "submit[ ] the Hydrology Report to Alaska Department of Environmental Conservation [DEC] for review" and that the report, along with Municipal Assembly and DEC review comments, be submitted to the Platting Board for "public hearing review" in May 2002. But the DEC had earlier declined an invitation to "assume authority over all water issues associated with the development"; it was willing to provide only informal support. To review Terrasat's report, the Municipality instead retained Shannon & Wilson, an environmental consulting firm. Shannon & Wilson "identified several areas of uncertainty in

the ground water resource evaluation" and opined that Terrasat's "conclusions [were] premature."

At the second hearing in May 2002, the Platting Board received numerous comments concerning the "Hydrology Report" and whether the developers had met the conditions of the earlier approval. Municipal staff testified that "a series of meetings had occurred with staff from [DEC], [the] Department of Health and Human Services (DHHS), OSWWS [Municipal On–Site Water and Wastewater Services], Shannon & Wilson and Terrasat, Inc. to review the preliminary hydrology report and subsequent revisions to the report." Experts retained by the Coalition asserted that the report still did not adequately address the nature of risks posed by the development. "Neighbors" likewise expressed ongoing concerns that the "data ... was insufficient to conclude that there would be no adverse impact on the water quality" and that water quality issues were not being adequately addressed by the Municipality.

In its statement of findings and conclusions, submitted on June 5, 2002, the Platting Board found that through "the studies done by the Municipality and peer review, as well as rebuttal [of critique] of the Terrasat report, many concerns were answered." Based on these and other findings indicating that the underlying aquifer was confined and protected from the effects of the proposed development, the Platting Board accepted the Hydrology Report and concluded that the "requirement of Condition No. 31 has been met ... based on the conclusion of all the involved professionals from ADEC, OSWWS, DHHS, [and] Shannon & Wilson 'that the development plan ... will provide adequate protection of the ground water quality in this area.'" In response to the Coalition's complaint that Condition No. 31 specifically required DEC review, the Platting Board first noted that "this condition was inserted in deference to the public opinion and the best effort was made to address that request." The Platting Board then indicated that it had the authority and ability to proceed without DEC review: "the Board is charged with weighing the testimony and information pre-

sented to it. Staff is charged with completely and accurately reviewing information provided in the packet. They have been hired for their positions based on rigorous qualification bases and interviews and . . . are qualified."

The Coalition appealed the Platting Board's decision to the Board of Adjustment. In a decision issued on May 13, 2003, the Board of Adjustment largely affirmed approval of the plat but remanded the matter to the Platting Board to require, among other things, that the developer (1) submit "additional testing of potential contaminants and mapping of aquifers and water flow"; (2) "address the issue of recharging existing wells and septic systems"; and (3) hold a public hearing on the hydrology and water quality issues.

By then, the DEC had taken an active interest in the matter; it had reviewed the preliminary plat application and made several recommendations to further protect and monitor ground water quality at the site. It issued a report on May 12, 2003 (the day before the Board of Adjustment issued its decision) in which it concurred that the exposed aquifer was not contiguous with the deeper confined aquifers that supply the area's wells and thus that the impact of development on water quality would be minimal. The DEC report had not been subjected to third-party review, and it is not clear that the Board of Adjustment was aware of this report when it remanded the matter to the Platting Board for additional information.

In response to the Board of Adjustment's requirement of additional testing, mapping, and consideration of the water quality issue, Terrasat—on behalf of the Hultquists—wrote a letter recounting its earlier findings and reiterating that the development would not significantly impact ground water quality. Several months later, Terrasat wrote a second letter presenting "additional information" in support of these conclusions. It noted several times in these letters that the DEC report was in accord with its own findings and conclusions.

The Platting Board held a hearing in September 2003 to review and deliberate the matters on remand. It issued a written decision on October 1, 2003. Relying in large part on the DEC report, the Platting Board found that "the remand to address the hydrology of the proposed development had been met." The Coalition criticized the DEC report, asserting, in sum, that it failed to "properly characterize subsurface conditions" resulting in an "unsubstantiated conclusion" that the local water supply would not be impacted. In response to the Coalition's criticisms of the DEC report and concerns that it had not been subjected to third-party review, the Municipal Planning Department had earlier recommended that the hearing be postponed to allow for third-party review of the report, but this request was denied.

The Coalition again appealed the Platting Board's decision to the Board of Adjustment alleging, among other things, that the Board erred "by not requiring the satisfaction of the three conditions in the Assembly remand with regard to protection of the area drinking water." The Coalition also objected to the Board's reliance on the unreviewed DEC report as satisfaction of the terms of the remand.

In its decision of July 8, 2004, the Board of Adjustment affirmed the Platting Board's decision, concluding that the "evidentiary record was expanded by the inclusion of information, analyses and documents which provided substantial evidence to support the Platting Board's decision." At issue, it seemed, was simply whether the developers had submitted "additional information," as previously directed. The Board of Adjustment found that it had. Like the Platting Board, the Board of Adjustment relied heavily on the DEC report (which it characterized as "an independent third party review and report") as "[e]vidence in the record showing additional testing of potential contaminants."

During pendency of that appeal, the Coalition moved to reopen proceedings before the Platting Board to allow for consideration of forthcoming evidence: the Alaska legislature had recently committed funds to the University of Alaska Anchorage (UAA) to perform an independent review of the DEC report and all "other existing records in order to fairly evaluate the potential impacts" of the

development. The Hultquists opposed the motion, noting that the "Board has already made clear it is comfortable with the record before it." The motion was denied. The UAA report was ultimately produced on October 6, 2004, a year after the Platting Board's approval of the plat and three months after the Board of Adjustment's decision on appeal.

The Coalition filed an appeal in superior court and moved for a trial de novo. It asserted that the court should make its own findings based on the evidentiary record because the "Platting Board lacks expertise in [the] subject matter of groundwater hydrology and evaluation of contamination to the groundwater drinking resource." It also sought to supplement the record on appeal with the UAA report and correspondence related to the requisition of that report, as well as the resumes of members of the Platting Board. The superior court denied both motions at oral argument and later explained the reasoning for its decision in a written order.

As to whether the issues on remand had been adequately addressed, the court affirmed the Platting Board's decision approving the plat. More specifically, the court held that "the conditions of remand requiring additional evidence of drinking water protection were satisfied" because there was "substantial evidence" that "additional testing of potential contaminants [had been] conducted by ADEC" and that an additional monitoring well had been installed. Similarly, the court found that there was "substantial evidence" to support the Platting Board's finding that additional mapping of the aquifers and of water flow had been performed. Again, the court cited the DEC report issued on May 13, 2003, which presumably constituted "new information." As for the requirement that the developer address the recharge of wells

and septic systems, the court noted that Terrasat had "provided additional discussion on the issue" in its post-remand letters.

The Coalition appeals.

## III. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion.

#### 1. De novo review

The Coalition claims that the superior court erred in denying de novo review, arguing that the Platting Board lacks the substantive expertise required to competently address the technical issues presented to it. Noting that none of the Platting Board members have degrees or backgrounds relevant to hydrology, the Coalition contends that the court should not defer to their findings of fact; rather, the Coalition would have the court review the technical information for itself and draw its own conclusions.

■■■ This would be a departure from the norm. A court normally reviews an agency's decision on the record.[1] While Appellate Rule 609 affords the superior court discretion to conduct a trial de novo,[2] it is rarely warranted.[3] This court has upheld or directed application of de novo review where certain issues are not within the expertise of the reviewing body; where the agency record is inadequate; where the agency's procedures are inadequate or do not otherwise afford due process; or where the agency was biased or excluded important evidence in its decision-making process.[4] We review the superior court's decision not to grant de novo review for abuse of discretion.[5] Under this deferential standard, we uphold the superior court's decision unless we are "left with a definite and firm conviction after reviewing

---

1. See *City of Fairbanks Mun. Utils. Sys. v. Lees*, 705 P.2d 457, 460 (Alaska 1985).

2. Alaska R.App. P. 609(b)(1).

3. See *Sw. Marine, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Alaska Marine Highway Sys.*, 941 P.2d 166, 179 (Alaska 1997).

4. See *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 270 (Alaska 2004) (citing *Eufemio v. Kodiak Island Hosp.*, 837 P.2d 95, 102 (Alaska 1992); *Lees*, 705 P.2d at 460; *State v. Lundgren Pac. Constr. Co.*, 603 P.2d 889, 896 (Alaska 1979)).

5. *Christensen v. NCH Corp.*, 956 P.2d 468, 473 (Alaska 1998).

the whole record that the trial court erred in its ruling."[6]

The premise for the Coalition's de novo argument here is that the Platting Board lacks expertise to decide whether the development will have an adverse impact on the area's groundwater supply. We agree with the superior court that this argument is without merit. The Coalition has misperceived the Platting Board's duty; it is not to determine the actual impact of the development on the area's groundwater. The Platting Board's duty is, more broadly, to determine whether the plat application conforms to the standards set forth in the municipal code.[7] More specifically, the Board's task on remand was to determine whether the developers had met the burden of providing additional information and ensuring that groundwater quality concerns were being addressed. For these endeavors, the Board members do not need degrees in hydrology or any other "surrogate expertise." Rather, the Board must be collectively qualified to "weigh[ ] the testimony and information presented to it" and to "completely and accurately review[ ] information provided." In this case, several reports were submitted and critiqued, and numerous experts in the field of hydrology offered written and verbal comments; the Board is entitled to rely on these submissions and then to apply its own judgment in determining whether the code's requirements have been met. We acknowledge that the data and conclusions ultimately relied on by the Board are controverted: experts disagree. But this does not mean that the Board is incompetent to ultimately determine whether—based on the information provided—the plat application merits approval.

The Coalition relies heavily on our decision in *Matanuska–Susitna Borough v. Lum* to argue that the Board does not meet policy-driven "criteria for expertise."[8] *Lum* is inapposite in this case because the appellant there had a *statutory right* to trial de novo.[9] The public policy issues discussed in that case—and upon which the Coalition relies here—were set forth only to justify the legislature's departure from the norm of discretionary trial de novo, not to establish a new standard for de novo review in the absence of such a statute.[10]

The Coalition is correct in asserting that "the superior court has discretion to authorize" de novo review, and also that de novo review "may be granted" when the administrative agency lacks relevant expertise; it follows that the court also has discretion to deny de novo review. It acted within its discretion in doing so here.

## 2. Supplementation of the record

The Coalition also claims that the superior court abused its discretion in not allowing it to supplement the record with the UAA report. The Coalition characterizes the report as a comprehensive, "independent evaluation of existing reports and data" that presents "new evidence" that the conclusions of the earlier reports were not justified. The Hultquists contend that the court acted well within its discretion in denying submission of a report that was produced more than a year after the conclusion of the administrative proceedings.[11]

6. *Id.*

7. Anchorage Municipal Code (AMC) 21.75.010(A)(2) (1996), for one, states that the Platting Board can only approve a plat if it finds that the plat "promotes the public, health, safety and welfare." *See also* AMC 21.10.020 (describing the powers and duties of the Platting Board).

8. *Matanuska–Susitna Borough v. Lum*, 538 P.2d 994, 994 (Alaska 1975).

9. *Id.* at 996.

10. *Id.* at 1000–01.

11. The Hultquists also argue that the UAA report has not been subjected to the rigors of the administrative process or third-party review. The Hultquists state that to remedy this by remanding the case to the Platting Board, as the Coalition suggests, would be "impossible, not to mention inordinately expensive." But the Hultquists have themselves relied heavily on evidence (namely the DEC report) that was not subjected to such rigors or review. Moreover, we note that the UAA report is itself a *review;* it does not purport to present new data so much as to comment on existing data and the conclusions that have been drawn from that data.

We have interpreted Appellate Rule 609(b)(1) to allow the superior court to consider additional evidence in the event that it decides to conduct a trial de novo in whole or in part.[12] And it may well be that de novo review is compelled in the first place by the need to consider new material evidence where evidence was improperly excluded during the administrative proceedings or the agency lacked expertise so that the appellant was denied due process.[13]

■ Having already found that the superior court acted within its discretion in denying de novo review, whether it erred in not permitting the Coalition to supplement the record with the UAA report is all but moot. Absent procedural irregularities at the administrative level, or some indicia that the Coalition's right to due process in presenting its case was compromised, we can only justify requiring supplementation of the record on a showing that the proffered evidence would impact the outcome of the case.[14] We recognize that the UAA report undermines the conclusions that the Platting Board relied upon in approving the plat and that it disagrees with many of the Board's findings. But the Coalition had every opportunity to present evidence refuting the developers' assertions throughout the administrative proceedings, and indeed it did so: its own experts provided cogent written comments and oral testimony controverting the data and conclusions submitted by the Hultquists. The UAA report is clearly relevant, and it may well have influenced the Board's decision. But it does not purport to turn the outcome of this case on its head, and as a procedural matter, the Coalition has identified no compelling legal basis for requiring its consideration by the superior court.[15]

## B. Substantial Evidence Supports the Platting Board's Decision.

The Coalition argues that substantial evidence does not exist to support the Platting Board's determination that the conditions on remand from the Board of Adjustment were met. More specifically, the Coalition criticizes the Platting Board's reliance on the DEC report as evidence of compliance with the requirement that "additional testing" be undertaken and new information provided. As discussed above, it is not our place to weigh the quality of the evidence relied upon by the Platting Board; at issue for the purposes of our review is simply whether substantial evidence exists. The superior court found that it did; having independently reviewed the record, we agree with its conclusion.

### 1. Standard of review

■■ When the superior court acts as an intermediate court of appeal in an administrative matter, we independently review the merits of the agency's decision.[16] We review an agency's factual findings under the substantial evidence standard, reversing the decision only if we "cannot conscientiously find that the evidence supporting [the agency's decision] is substantial."[17] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[18]

The Coalition urges us to incorporate the *Daubert* test into our standard of review and to independently evaluate the admissibility or reliability of the expert testimony relied on

---

**12.** *Sw. Marine, Inc.,* 941 P.2d at 179; *Lundgren Pac. Constr. Co.,* 603 P.2d at 896 n. 18.

**13.** *Eufemio,* 837 P.2d at 102; *Lundgren Pac. Constr. Co.,* 603 P.2d at 895–96.

**14.** *See Sw. Marine, Inc.,* 941 P.2d at 179–80.

**15.** The Coalition's reliance on *Native Village of Eklutna v. Board of Adjustment,* 995 P.2d 641, 645–46 (Alaska 2000), makes little sense; there, having already remanded the case to the agency for lack of substantial evidence supporting its findings, we simply directed the agency to "exer-

cise ... its discretion" in deciding whether to admit a report that had not previously been considered. *Id.* at 645–46.

**16.** *Williams v. Abood,* 53 P.3d 134, 139 (Alaska 2002).

**17.** *Robinson v. Municipality of Anchorage,* 69 P.3d 489, 493 (Alaska 2003) (citation omitted); *see also Williams,* 53 P.3d at 139 (citation omitted).

**18.** *Leigh v. Seekins Ford,* 136 P.3d 214, 216 (Alaska 2006) (citation omitted).

by the agency in its decision.[19] *Daubert* speaks to the bare *admissibility* of expert testimony; it has no bearing on the standard of review here. The admissibility of expert evidence is more appropriately challenged when the evidence is presented. Having failed to do so in proceedings below, the Coalition is not at liberty to ask us to evaluate the reliability of the evidence here.

### 2. Conditions on remand

■ In its remand to the Platting Board, the Board of Adjustment directed the Board to "require the submission ... of additional testing of potential contaminants and mapping of aquifers and water flow" and to require the developer to "address the issue of recharging existing wells." These mandates were at once objective—and therefore readily measurable—and decidedly vague. At bottom, compliance was essentially predicated on the submission of additional information; no standard of scientific certainty was required, nor was there a requirement that conflicting evidence and assessments be reconciled, or even that issues be "adequately" addressed rather than just "addressed."

Admittedly, the evidence submitted in fulfillment of these requirements was controverted and sparse; the Hultquists rely heavily on the DEC report as the "additional information," as well as the boring of one new monitoring well. These new submissions were not subjected to third-party review and arguably added little to the collective understanding of the area's geohydrology and the risks presented by development. But the Platting Board and the Board of Adjustment could nonetheless conclude that the terms of the remand were technically satisfied: "substantial evidence" exists to support a finding that "additional information" was presented and that issues were "addressed." Notably, the Board of Adjustment, which itself crafted the directives on remand, was satisfied by the Hultquists' response to that mandate. Here, "substantial evidence" both supporting and opposing the Hultquists' conclusions exists and was considered by the Platting Board in its decision-making process. In light of the deferential standard we apply on appeal, we must affirm the Platting Board's finding.

### 3. Approval of the plat

The Coalition also argues that the Platting Board's decision to approve the plat offends the municipal code. Specifically, the Coalition asserts that the plat fails to "promote the public, health, safety and welfare" and to "avoid land use incompatibilities with surrounding neighborhoods."[20]

■ Whether the plat application conforms to the standards of the municipal code and merits approval is a question of law that "implicate[s] specialized agency expertise or the determination of fundamental policies within the scope of the agency's statutory function."[21] We therefore review the Platting Board's decision using the rational basis standard of review.[22] This standard is highly deferential and requires only that we find that the agency's decision was "reasonable," regardless of whether we actually agree with it.[23]

■ The cited mandates of the municipal code are fairly subjective. Of note, the Coalition misstates the code as requiring that a plat "avoid" land use incompatibilities; in reality, it only requires that such effects be "mitigated."[24] Broadly speaking, we interpret the code not to require that the Platting Board ensure that there will be no adverse impacts, but rather to balance these against the project's benefits and to determine whether, in the aggregate, the public welfare will be promoted. To this end, three public

**19.** *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also State v. Coon*, 974 P.2d 386, 395 (Alaska 1999) (adopting the *Daubert* standard).

**20.** *See* AMC 21.75.010(A)(2)-(3).

**21.** *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

**22.** *Id.*

**23.** *Id.*

**24.** AMC 21.75.010(A)(3).

hearings were held in this case, numerous technical reports were submitted and reviewed, and input from state and local agencies and concerned citizens was considered. Procedurally, the Platting Board appears to have discharged its duty according to the terms of the municipal code, and we agree with the superior court's determination that, in substance, the Platting Board had a "rational basis" for approving the plat.

## IV. CONCLUSION

In accord with our analysis above, we AFFIRM the superior court's denial of the Coalition's motion to conduct de novo review of the record and to supplement the record. We further hold that substantial evidence supports the decision of the Platting Board to approve the plat, and therefore AFFIRM the Board's decision.

MATTHEWS, Justice, not participating.