*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| GAYLE HORNER-NEUFELD, | ) | |
| | ) | Supreme Court No. S-15782 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-10-01740 CI |
| v. | ) | |
| | ) | O P I N I O N |
| UNIVERSITY OF ALASKA | ) | |
| FAIRBANKS, SCHOOL OF FISHERIES | ) | No. 7147 – January 20, 2017 |
| AND OCEAN SCIENCES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Jane F. Kauvar, Judge.

Appearances: James Hackett, Fairbanks, for Appellant. Susan Orlansky, Reeves Amodio LLC, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Maassen, Bolger, and Carney, Justices. [Winfree, Justice, not participating.]

BOLGER, Justice.

## I. INTRODUCTION

A student was dismissed from a Ph.D. program at the University of Alaska Fairbanks after several years of poor performance and negative feedback. She claims that her advisors discriminated and retaliated against her, that she was dismissed in

violation of due process, and that the University breached duties owed to her under an implied contract. We affirm the superior court's decision to uphold the University's action because the student was dismissed based on her poor research performance and the dismissal was conducted under adequate procedures and within accepted academic norms.

## II.    FACTS AND PROCEEDINGS

### A.    The Program

Students in the Ph.D. program in the School of Fisheries and Ocean Science (SFOS) at the University must advance to Ph.D. candidacy to become eligible for the degree. To advance to candidacy, students are required to complete course work, pass a comprehensive examination, and obtain approval for a thesis project. To receive a Ph.D., students must complete a thesis that will contribute to the body of knowledge in their area and pass an oral defense.

Each graduate student is guided through the program by an advisor and an advisory committee. Students are initially assigned to an advisor based on their research interests, and the student is responsible for selecting and obtaining approval for at least three additional committee members. The advisor is a faculty member who must consent to the assignment; he or she also chairs the advisory committee, so the advisor-student relationship is a critical factor in the student's success. The committee develops a graduate study plan with the student, provides research expertise, approves the student's thesis proposal, and conducts the written examination and oral defense. The committee may refuse to recommend a student for candidacy.

Students are expected to meet with their advisory committee at least once a year and must submit an annual committee report. The report contains the committee's comments about the student's course work and research progress and includes an overall progress rating of Satisfactory, Conditional, or Unsatisfactory. If the rating is

Conditional or Unsatisfactory, the report provides the committee's recommended actions for improvement and the consequences if improvement does not occur. If a student does not file a Satisfactory report each spring, the student may be placed on probation.

The SFOS graduate program is intended to be "an intense, coordinated effort, undertaken in a relatively short time." By the end of the first year, students should have an advisor and an advisory committee. At 18 months, the student's thesis project should be "fairly well outlined." Students should take the comprehensive examination and advance to candidacy at the end of the second year. A student should be able to complete the degree in five years; regardless, students must complete the degree within ten years.

### B. Horner-Neufeld's Attendance At SFOS

Gayle Horner-Neufeld was a Ph.D. student in marine biology between January 2003 and January 2009. During those six years, Horner-Neufeld demonstrated great success in her course work but struggled with the program's research component and ultimately did not obtain a degree.

Horner-Neufeld was initially assigned to two co-advisors: Dr. Katrin Iken and Dr. Brenda Konar. During her first year, she met with some bad luck; she suffered a head injury, and she abandoned her first potential thesis project after the field component was destroyed by strong waves. She struggled to complete another thesis proposal after rejecting advice from Dr. Iken to switch to a more manageable master's project. After receiving a Conditional rating in her annual committee report for 2003-2004, Horner-Neufeld changed projects several more times, and after she submitted yet another incomplete thesis proposal in July 2004, both advisors resigned.

This development was problematic for Horner-Neufeld, who was now over 18 months into her program but lacked an advisory committee, a complete thesis proposal, and an advisor. Due to her specific research focus, few faculty members were

qualified to advise her. Horner-Neufeld contacted faculty members throughout the 2004-2005 academic year. But she also focused on bringing grievances to administrators about her initial advisors, complaining that they had dropped her without warning. In February 2005, she met with two SFOS administrators, Drs. Denis Wiesenburg and Michael Castellini, to discuss her concerns. On February 7, 2005, Dr. Wiesenburg, who was then dean of SFOS, sent Horner-Neufeld a letter summarizing their conversation, telling her that they would investigate her complaint against Drs. Iken and Konar, but that she would be dismissed from the program if she did not find an advisor by May 15:

> [Y]ou will not be eligible to continue as a graduate student in our Marine Biology program unless you find a qualified advisor to supervise your work . . . , as the relationship between the advisor and student is the major factor that determines a student's success in any graduate program. . . . I encourage you to focus your efforts on moving forward and finding an advisor so you may continue working toward your Ph.D. in our program.

To assist Horner-Neufeld in meeting this deadline, SFOS funded a trip to Juneau so that she could meet potential advisors, and the head of the SFOS marine biology program offered faculty incentives. Horner-Neufeld ultimately began working with Dr. Michael Stekoll, whom she met in Juneau on the SFOS-funded trip, and Dr. Peter McRoy. That year, she received an overall rating of Satisfactory, and her annual report for 2004-2005 emphasized that "it [was] critical for [Horner-Neufeld] to now focus on her research."

Over the next two and a half years, Horner-Neufeld submitted funding proposals and worked on developing her thesis project, but she encountered difficulties with both. Horner-Neufeld received only a single $500 grant in 2005-2006 and only submitted one grant proposal in 2006-2007. Her committee attributed this in part to Horner-Neufeld's failure to meet internal deadlines; she countered that her advisors did not provide timely feedback and requested too many revisions. She also submitted

several drafts of her thesis proposal to her advisors and committee, but none were deemed complete. The required annual report for 2005-2006 was never filed,[1] and the following year, Horner-Neufeld did not have an annual committee meeting in the spring. She ultimately met with her committee in December 2007, and her annual report for 2006-2007 was filed in March 2008, almost one year late. In her report, Horner-Neufeld was given her second Conditional rating and instructed to "prepare a detailed thesis proposal that can be used to guide and implement a research program that will lead to a successful dissertation" in order to return to Satisfactory status. The deadline for this proposal was March 27, 2008. Horner-Neufeld submitted a draft before this deadline, which her advisors did not find satisfactory, and she soon found herself, more than five years after entering the program, once again without an advisor.

Horner-Neufeld arranged to perform research tasks over the summer of 2008 for Dr. Arnold Blanchard, a recent Ph.D. graduate who had joined the faculty since her first advisor search in 2004-2005. He would be her supervisor and, if the relationship went well, become her advisor.[2] Horner-Neufeld began developing a new thesis project based on a data set she received from him, and she sent an outline in May to

---

[1] Graduate students were reminded from time to time that it was the student's responsibility to ensure timely filing of annual committee reports. However, according to Horner-Neufeld, Dr. McRoy had told her that he would type up the report but failed to do so even after she reminded him. The program updated its policy in January 2008 to state that timely report submission was the advisor's responsibility and students could file a rebuttal.

[2] Horner-Neufeld now claims that Dr. Blanchard was her advisor, not her supervisor, citing an email she wrote in December 2008: "[Dr. Blanchard] had recruited me to be his graduate student . . . . [H]e was my advisor, by his choice." At least three witnesses stated that Dr. Blanchard had made it clear to her that he was not her advisor. In an earlier affidavit, Horner-Neufeld did not actually characterize him as her advisor, though she referred to Drs. Konar, Iken, McRoy, and Stekoll as co-advisors. She also said only that they "discussed" advisorship.

Drs. Blanchard and Castellini. But in August, this relationship too broke down after Horner-Neufeld requested that Dr. Blanchard reschedule a group meeting two days in a row shortly before a research trip. Dr. Blanchard then removed her from the research trip, and Horner-Neufeld left the state to visit family. When she returned in September 2008, the University arranged a mediation session between Dr. Blanchard and Horner-Neufeld but could not repair the relationship. In November, Dr. Wiesenburg told her that she would be de-listed from SFOS on January 22, 2009.

By the time Horner-Neufeld was ultimately de-listed, no Satisfactory report had been filed in over three years, her last report of Conditional had stood for two semesters, and she had been without an advisor or committee for nine months. She never submitted a satisfactory thesis project proposal to her advisors or took a comprehensive exam.

## C.     Proceedings

### 1.     Discrimination complaint and appeals

In April 2009, Horner-Neufeld filed a complaint with the University Office of Equal Opportunity (OEO). She alleged discrimination, retaliation, and a hostile learning environment. She requested two remedies: (1) "accountability" and (2) compensation for the time and money she had invested in the program. When prompted for the bases of her discrimination claims, she selected age and gender.

Earlina Bowden, the OEO director, conducted an investigation and produced a report, concluding that Horner-Neufeld had not been discriminated against or suffered a hostile learning environment. Horner-Neufeld pursued additional review within the University system, but Bowden's conclusions were upheld.

Horner-Neufeld appealed the University's decision to the superior court. The superior court determined that Horner-Neufeld had mistakenly (but understandably) pursued her claims through OEO rather than the academic appeals process. It also

appeared that Horner-Neufeld had not been formally dismissed. The court remanded the case to the University and ordered Horner-Neufeld to pursue her claims through the academic appeals process. The court also denied without prejudice Horner-Neufeld's motion for a trial de novo under Alaska Appellate Rule 609(b).

### 2. Formal dismissal and appeal

One month later, Dr. Castellini, who was now dean of SFOS, sent a memorandum to the dean of the Graduate School formally recommending Horner-Neufeld's dismissal. He summarized Horner-Neufeld's difficulties and concluded that Horner-Neufeld lacked an advisory committee as a result of her own poor performance, despite assistance and support from SFOS. He stated that without a committee, Horner-Neufeld could not file the annual Satisfactory report that was required to remain in good standing.

The dean accepted Dr. Castellini's recommendation and sent a formal notice of dismissal to Horner-Neufeld on May 20, 2013. He stated two independent bases for his decision to dismiss: (1) Horner-Neufeld was rated Conditional in spring 2008 and thus was not in good standing and (2) Horner-Neufeld lacked a graduate committee due to her poor performance.

Horner-Neufeld did not believe the academic appeals policy applied to her situation, but she pursued review through the University system "under protest." The provost convened a committee to review Horner-Neufeld's dismissal and offered Horner-Neufeld the opportunity to submit supporting documents. The appeals committee met in June 2013 and dismissed the appeal, finding that Horner-Neufeld had not provided sufficient evidence of arbitrary and capricious decisions by her advisors, SFOS, or the University. The committee observed that Horner-Neufeld "chose not to include several key pieces of evidence that could have . . . support[ed] [her] statements." In particular, she provided no evidence of her research progress despite her core argument that she was

dismissed as retaliation for complaints against faculty rather than for her inadequate progress. The committee found "no evidence indicating that [she] had made progress toward completion of [her] comprehensive exams or [her] research."

Horner-Neufeld returned to the superior court. She argued that the University had violated her due process rights and that she had an implied contract with the University, which it had breached. The superior court rejected all of Horner-Neufeld's arguments and she now appeals.

## III.  STANDARD OF REVIEW

In administrative appeals, we directly review the agency's factual findings for substantial evidence.[3] We review the superior court's denial of a trial de novo for abuse of discretion.[4]

We review a school's compliance with its policies to determine if the decision was arbitrary, unreasonable, or an abuse of discretion.[5] Whether university policies comply with due process is a question of law to which we apply our independent judgment.[6] We grant substantial discretion to university faculty and administrators in academic matters.[7]

---

[3]     *Richards v. Univ. of Alaska*, 370 P.3d 603, 609 (Alaska 2016).

[4]     *Gottstein v. State, Dep't of Nat. Res.*, 223 P.3d 609, 628 (Alaska 2010).

[5]     *Nickerson v. Univ. of Alaska Anchorage*, 975 P.2d 46, 50 n.1 (Alaska 1999).

[6]     *Id.*

[7]     *Bruner v. Petersen*, 944 P.2d 43, 48 (Alaska 1997).

Because it is a question of law not requiring agency expertise, we apply our independent judgment when determining whether a contract exists between a university and a student.[8]

## IV. DISCUSSION

In this appeal, Horner-Neufeld brings multiple challenges based on two University actions: (1) the University's finding that she suffered no discrimination and (2) the University's decision to dismiss her from the Ph.D. program. Regarding discrimination, she challenges OEO's findings and investigative process and subsequent procedural decisions by the University and the superior court. Regarding dismissal, she argues that the University violated her procedural and substantive due process rights and breached an implied contract with her. We reject these arguments.

### A. Discrimination

Horner-Neufeld filed the original complaint with OEO based on her understanding of "UAF's broad definition of discrimination" rather than "normally understood protected categories." Although she chose age and gender when prompted, Horner-Neufeld does not actually argue discrimination on these bases, and we do not address them here.

Under the University's policy, discrimination is defined as "being adversely treated . . . in a manner that . . . makes distinctions on . . . some basis other than an individual's qualifications, abilities and performance."[9] Horner-Neufeld argues two bases for discrimination. First, she argues she was mistreated specifically in retaliation for making protected complaints. Second, she argues that because her grades were good and she was never placed on academic probation or given notice of performance issues,

---

[8] *Id.* at 47 n.5.

[9] Regents' Policy P04.02.020(B).

her advisors' and supervisor's adverse treatment of her must have been generally on "some basis other than [her] qualifications, abilities and performance," i.e., discrimination under the University's definition.

Horner-Neufeld also raises procedural issues with the OEO investigation itself and her subsequent appeals. Her core argument appears to be that because nobody gave her notice of performance issues, the faculty and administrators' actions towards her could not have been based on performance.

Horner-Neufeld thus challenges the OEO investigation as "incomplete" based primarily on Bowden's failure to include information that suggested procedural deficiencies in her treatment. She argues that the interviewees must have lied to Bowden because there was "no documentation of [poor performance] claims" and that they made false or pretextual statements about her performance in retaliation for her bringing the complaint. She also challenges the superior court's denial of a trial de novo.

### 1. OEO's findings were supported by substantial evidence.

We review OEO's factual findings for substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10] "We need only determine whether such evidence exists, and do not choose between competing inferences."[11]

As part of her investigation, Bowden interviewed at least six staff members, administrators, and faculty, including two of Horner-Neufeld's former advisors (Drs. Iken and McRoy) and Horner-Neufeld's 2008 supervisor (Dr. Blanchard). She also reviewed Horner-Neufeld's complaint, the annual committee reports, and "numerous pages of emails" supplied by Horner-Neufeld and others.

---

[10] *Richards v. Univ. of Alaska*, 370 P.3d 603, 609 (Alaska 2016).

[11] *Id.*

Bowden found that Horner-Neufeld had not been discriminated against or suffered a hostile learning environment. Rather, all of the allegedly discriminatory actions stemmed from Horner-Neufeld's own performance. Bowden observed that Horner-Neufeld's advisors had raised concerns about her research abilities as early as 2004 in her first committee report. Bowden acknowledged that Horner-Neufeld's grades were good but stated that her advisors were concerned about her research, not her grades. Bowden saw no evidence of discrimination or a hostile learning environment but found "ample evidence that [Horner-Neufeld's] research performance was poor." Bowden did not explicitly address retaliation, but the absence of retaliation is similarly supported by Bowden's conclusion that the actions taken against Horner-Neufeld were based on her research performance rather than improper motives.

Horner-Neufeld offers only competing inferences. She points to positive comments that were omitted from Bowden's report. She raises procedural deficiencies as evidence that she had no performance issues. She places emphasis on her grades and minimizes the significance of her Conditional reports, arguing that neither report stated that her performance was "poor." But she does not address the main problem with her OEO complaint — that she produced *no* direct evidence of discrimination and instead asked Bowden to infer, despite ample evidence to the contrary, that she had been discriminated against.

Bowden's findings are supported by substantial evidence. The record suggests that Horner-Neufeld's advisors withdrew for reasons related to her research performance. Her first pair of advisors, Drs. Konar and Iken, withdrew after Horner-Neufeld submitted an incomplete thesis proposal in July 2004 despite instructions in a Conditional report to complete a full proposal draft by February. They had already reviewed and provided comments on several previous incomplete drafts, and Dr. Iken had suggested to Horner-Neufeld that she switch to a master's project that would be

more manageable. Horner-Neufeld's relationship with Drs. McRoy and Stekoll followed a similar pattern: Horner-Neufeld submitted incomplete thesis proposals; her advisors gave her feedback and then a deadline attached to a Conditional report; and when she submitted yet another incomplete draft in March 2008, Dr. McRoy resigned as her advisor. According to that same Conditional report, Horner-Neufeld consistently sent draft grant proposals without allowing enough time for feedback and revision. As a result, she only received one research grant in 2005-2006 and only submitted one grant proposal in 2006-2007. Without a well-developed thesis proposal, it was difficult for Horner-Neufeld to obtain research funding, but her failure to obtain such funding likewise imperiled the success of her thesis project.

Nobody disputes Horner-Neufeld's solid performance in the course work component of her degree program, but there was ample evidence to show that she struggled with her research. No matter her achievements in the classroom, Horner-Neufeld, after six years, four advisors, and multiple drafts with feedback, had never submitted a complete proposal for the core requirement of her Ph.D. program — a thesis that would contribute to the body of knowledge in her field.[12] The University's conclusion that her negative experiences were a result of her poor performance was supported by substantial evidence.[13]

---

[12] Horner-Neufeld does not argue that her advisors should have accepted any of her draft thesis proposals as complete; in May 2008, over five years into her ten-year program, she had just developed an outline for yet another new thesis project.

[13] Horner-Neufeld raised two additional allegations in her OEO complaint, which we address only briefly. First, Horner-Neufeld claims that Dr. Blanchard retaliated against her by terminating the supervisor-student relationship because she told him she would "take this further" when he dropped her from the research trip. Bowden found that Dr. Blanchard was justified in terminating the relationship because Horner-Neufeld left the state. Second, Horner-Neufeld claims that Dr. Wiesenburg "threatened
(continued...)

## 2.     OEO's investigation was thorough and legitimate.

Under University regulations, Bowden was required to consider "the record as a whole, . . . the totality of the circumstances, and . . . regulatory guidelines."[14]  The record shows that she did so.  She interviewed every person implicated in Horner-Neufeld's complaint and reviewed all documents submitted, and she expressly referenced the Regents' Policy definition of discrimination.  Bowden collected several perspectives on the events Horner-Neufeld described, engaged in a detailed analysis of the witnesses' statements, and specifically described where and why she declined to credit Horner-Neufeld's allegations.  Although Horner-Neufeld contends that Bowden did not interview her, the University's regulations require no such interview,[15] and Horner-Neufeld does not explain what additional evidence such an interview would have uncovered that was not sufficiently addressed by her complaint.  Bowden's investigation appears thorough and compliant, and Bowden found no indication that Horner-Neufeld had been treated differently based on any factor other than her academic performance.

Horner-Neufeld provides no support for her contention that Bowden's interviewees retaliated against her in their statements during the OEO investigation.  She apparently falls back on her core argument that because she was provided with no notice of performance issues, any statements suggesting poor performance must be false.  But

---

[13]     (...continued)
[her] with dismissal from the program" when she raised her concerns about her treatment by Drs. Konar and Iken.  Bowden found that, rather than discriminating or retaliating against her, Dr. Wiesenburg tried to help her; although he did inform her that she needed to find an advisor or else she would be dismissed, he used discretionary funds to help her find that advisor.  Substantial evidence supports Bowden's findings.

[14]     University Regulation R04.02.020(E)(3).

[15]     University Regulation R04.02.020.

as we have already explained, there was substantial evidence, supported not only by interviewees' statements but also by the administrative record, to show that Horner-Neufeld struggled with the research component of her Ph.D. program. There was also substantial evidence to show that, rather than retaliate, the SFOS administration tried to support her. Horner-Neufeld raised her initial complaints about Drs. Konar and Iken in February 2005; rather than retaliating by dismissing her immediately, the program provided funding and offered faculty incentives to help her with her advisor search; provided additional research funding in 2007 after she was unsuccessful in winning any grants; and monitored her situation and worked to address problems, such as arranging for mediation with Dr. Blanchard. Horner-Neufeld's attempts to impeach individual interviewees by challenging specific facts unrelated to her research performance are ultimately irrelevant in light of the ample evidence showing that she had difficulty developing a complete thesis proposal and winning research grants.

### 3. The superior court did not abuse its discretion by denying a trial de novo.

Under Alaska Appellate Rule 609(b), the superior court has the discretion to grant a trial de novo in an appeal from an administrative agency. This procedure is "rarely warranted."[16] A trial de novo is appropriate, *inter alia*, "where the agency record is inadequate; where the agency's procedures are inadequate or do not otherwise afford due process; or where the agency was biased."[17] Those circumstances are not present here.

As discussed above, the OEO's investigation of Horner-Neufeld's discrimination complaint — and the record thereof — was thorough. Although Horner-

---

[16] *S. Anchorage Concerned Coalition, Inc. v. Municipality of Anchorage Bd. of Adjustment*, 172 P.3d 774, 778 (Alaska 2007).

[17] *Id.*

Neufeld alleges that the investigation was inadequate because Bowden focused primarily on the protected categories of gender and age, Bowden's report does not support this claim; her analysis extended beyond these categories in her conclusion that Horner-Neufeld's poor performance was the sole reason for her negative feedback and experiences. And as explained above, Horner-Neufeld did not support her allegation that the interviewees' statements about her poor performance were mere pretext made in retaliation for her complaint; thus there is no evidence of agency bias. We conclude that the superior court did not abuse its discretion by denying a trial de novo on Horner-Neufeld's discrimination complaint.

## B. Procedural Claims

Horner-Neufeld makes several procedural claims, which we address in two stages. First, we determine whether the University complied with its own procedures when dismissing Horner-Neufeld. Second, we determine whether Horner-Neufeld's dismissal complied with the due process owed to her under the Alaska and U.S. Constitutions.[18]

### 1. The University complied with its own procedures in dismissing Horner-Neufeld.

Horner-Neufeld argues that under the University's policies governing academic discipline, she was not given proper notice for her dismissal. We review whether the University's application of its dismissal policy was arbitrary, unreasonable,

---

[18] *See* U.S. Const. amend. XIV; Alaska Const. art. I, § 7.

or an abuse of discretion[19] and determine whether the University substantially complied with its published policies.[20]

The University publishes three documents relevant to this matter: (1) the academic catalog; (2) the SFOS Graduate Student Manual; and (3) the Graduate Advising Manual. Both the Graduate Student Manual and the Graduate Advising Manual defer to the catalog as the "ultimate authority" for policies, regulations, and responsibilities.

The academic catalog is published annually and contains policies and regulations, including graduation requirements. Although a graduate student may choose which catalog to use for his or her degree requirements, the student is subject to "[a]ll non-academic policies and regulations listed in the current catalog." According to the academic catalog, a student may be disqualified from graduate study by the dean of her school based on poor performance. The catalog also defines requirements for remaining in "good standing." In the 2002-2003 catalog, good standing is defined solely based on grades — the student "must maintain a cumulative GPA of 3.0." However, "good standing" was modified in later catalogs; as of 2004-2005, students were also required to have filed an annual Satisfactory committee report to remain in good standing and avoid being placed on probation. This updated definition was still in effect as of the 2008-2009 catalog.[21]

---

[19] *See Nickerson v. Univ. of Alaska Anchorage*, 975 P.2d 46, 50 n.1 (Alaska 1999).

[20] *Id.* at 50.

[21] The 2002-2003 catalog would have been in effect when Horner-Neufeld entered the program. The 2008-2009 catalog would have been in effect when Horner-Neufeld was de-listed from SFOS. In his 2013 memorandum formally recommending

(continued...)

The Graduate Student Manual is a handbook produced by SFOS and intended as a guide for SFOS students. It provides details for the advisor and advisory committee selection process, stating that the faculty member and the committee members must agree to serve in those roles. It provides a recommended timeline for Ph.D. students completing their degrees within five years. Although the Graduate Student Manual does not discuss good standing or dismissal policies, it lists as a degree requirement that Ph.D. students must submit a committee report annually.

On the opposite side of the relationship, the Graduate Advising Manual is a handbook produced by the Graduate School and intended as a guide for faculty. The Graduate Advising Manual repeats the requirement that a Satisfactory committee report must be filed annually and explains the consequences of a Conditional report: "[S]tudents who fail to correct deficiencies indicated by Conditional or Unsatisfactory reports can be dismissed on recommendation of their committee, Department Chair, and Dean." The Graduate Advising Manual also describes a written warning requirement for dismissals due to inadequate progress:

> "Fair Warning" means adequate notice to the student that dismissal is a probable or certain consequence of his or her performance or actions. This notice can simply be catalog policies . . . . In the case of dismissal for inadequate progress, the student must receive a written warning of pending dismissal at least one semester before the dismissal occurs and be given a reasonable opportunity to demonstrate adequate progress. . . .
>
> The committee must document the lack of progress with "conditional" or "unsatisfactory" Reports of Graduate Advisory Committee . . . over a period of at least a year. An

---

[21] (...continued) dismissal, Dr. Castellini cited the 2008-2009 definition; Horner-Neufeld did not challenge this in her academic appeal.

explicit dismissal warning must be issued, in writing, at least one semester before the dismissal can occur.

The parties dispute the applicability of the Graduate Advising Manual. Horner-Neufeld argues that the University was required to comply with the dismissal procedures in the Graduate Advising Manual and did not provide a written dismissal warning at least one semester before she was dismissed in 2009. She claims that because University regulations direct students to become informed about rules and procedures, she could reasonably rely on the Graduate Advising Manual as a source of procedural rights. The University replies that "Horner-Neufeld's attempts to attach greater significance to the [Graduate Advising Manual] are mistaken."

We conclude that the Graduate Advising Manual did not create any procedural rights. The Graduate Advising Manual is expressly directed at faculty, not students; it defers to the academic catalog as the "ultimate authority" for academic policies. However, even if the Graduate Advising Manual were binding, we conclude that the University substantially complied with its policies.

Horner-Neufeld was dismissed due to unsatisfactory performance and because she lacked a committee. She had adequate notice of her responsibilities as a student with respect to both of these conditions and their consequences. The catalog stated that she could be "disqualified from graduate study" if her performance was deemed unsatisfactory. The catalog required her to file a Satisfactory committee report every year to remain in good standing, and she needed to have an advisor and committee in order to obtain this report. She knew from the Graduate Student Manual that faculty members needed to consent to serve as her advisor and committee members. She knew from Dr. Wiesenburg's letter in February 2005 that she would be dismissed if she had no advisor. She was told after Dr. McRoy withdrew that she needed to establish an

advisory committee for fall 2008 and that developing a successful working relationship with Dr. Blanchard was her last chance to accomplish her goals.

Horner-Neufeld also had adequate notice that she was in danger of dismissal due to lack of progress. The Graduate Student Manual said that her project should be "fairly well outlined" within one and a half years. She knew from the catalog that she was required to complete all of her Ph.D. requirements within ten years, including her course work, comprehensive examination, thesis, and oral defense. But five years into the program, she still had not developed a satisfactory thesis proposal.

The Graduate Advising Manual itself says that a failure to correct deficiencies in a Conditional report can lead to dismissal based on committee and dean recommendation. Horner-Neufeld received written notice of Conditional status twice, specifically due to her lack of a complete thesis proposal; she received the second Conditional report shortly after her committee meeting in December 2007, which gave her two semesters of notice before she was de-listed in January 2009. She did not fix the condition in that report because she did not prepare a detailed thesis proposal by the March 2008 deadline. She does not dispute that she failed to meet this requirement.

Accordingly, we conclude that the University abided by its policies here.

### 2. Horner-Neufeld's dismissal complied with academic due process.

To satisfy due process under the Alaska and U.S. Constitutions, an academic dismissal requires only notice and a careful decision: "[D]ue process is satisfied if (1) the school fully informs the student of its dissatisfaction with his performance and the danger that this deficiency poses to continued enrollment, and (2) the ultimate decision to dismiss is careful and deliberate."[22] Notice must precede

---

[22] *Nickerson*, 975 P.2d at 53 (citing *Bd. of Curators of Univ. of Mo. v.*
(continued...)

dismissal "by a reasonable time so that a student has a reasonable opportunity to cure his or her deficient performance."[23] No hearing is required.[24]

Both requirements are satisfied here. As explained above, Horner-Neufeld received notice about her responsibilities as a student, including that she needed to have an advisor and a committee and that she could be dismissed for unsatisfactory performance. The program made clear to her that it was dissatisfied and gave her a reasonable opportunity to cure both conditions.

With respect to the advisor, the program gave Horner-Neufeld notice in February 2005 that not having an advisor would lead to her dismissal. The program also gave her a reasonable opportunity to cure the issue and helped her with the advisor search by funding her trip to Juneau to meet Dr. Stekoll. When Dr. McRoy withdrew in spring 2007, she was again told that she needed to have an advisor. With respect to her unsatisfactory performance, she knew that she was responsible for filing an annual Satisfactory report and that a Conditional report could lead to dismissal. Her advisors and committee made clear to her through two Conditional reports in writing that she needed to submit a complete thesis proposal. She had notice of dissatisfaction with her progress after the committee meeting in December 2007 and the requirement to submit

---

[22]  (...continued)
*Horowitz*, 435 U.S. 78, 85 (1977)).

[23]  *Id.*

[24]  *Id.* Horner-Neufeld argues that she was owed a hearing under the theory that she had a property interest in her continued enrollment. We have not previously held that such a property interest exists, and we are not persuaded to hold so here. *See Richards v. Univ. of Alaska*, 370 P.3d 603, 613 (Alaska 2016). Our cases follow the lead of the U.S. Supreme Court in holding that no hearing is required. *See Horowitz*, 435 U.S. at 90 ("[W]e decline to . . . formalize the academic dismissal process by requiring a hearing.").

a proposal by March 2008; she did not meet this requirement. She was given a reasonable opportunity to cure her Conditional status; the deadline was even extended from January to March after she raised concerns. Thus, the University met the notice requirement.

The University also met the requirement that the decision to de-list Horner-Neufeld in January 2009 was careful and deliberate. Horner-Neufeld had struggled with research since at least her first Conditional report in January 2004. In six years, she never produced a satisfactory thesis proposal despite requests, with deadlines, from her advisors, and despite the Graduate Student Manual's guidance that a proposal be developed within 18 months. Research funding was critical for her success, but she had trouble winning and even submitting grant proposals. She also struggled to find an advisor; her first search took eight months, and because of her chosen research area, there were few faculty members who were qualified to supervise her. Dr. Blanchard, her 2008 supervisor, was her last opportunity to succeed in having an advisor, and when that relationship broke down, the program was unable to repair it through mediation. The program observed Horner-Neufeld's progress for six years; it is difficult to characterize the decision as anything other than careful or deliberate.

We therefore conclude that the University satisfied the requirements of procedural due process.

### C. Substantive Due Process

Horner-Neufeld next claims that her substantive due process rights were violated. We have held that a university's dismissal decision denies the student substantive due process if that decision is "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not

actually exercise professional judgment."[25]    We allow faculty and administrators substantial discretion in academic decisions and recognize that courts "should show great respect for the faculty's professional judgment."[26]

As explained above, Horner-Neufeld was dismissed due to unsatisfactory performance and because she lacked a committee.  Bowden's OEO investigation found ample evidence of poor performance; we grant substantial discretion to the faculty members' evaluations of the completeness of Horner-Neufeld's draft thesis proposals, the quality of her grant funding submissions, and her overall progress in the annual committee reports.  In her academic appeal to the University, Horner-Neufeld did not challenge OEO's conclusion by providing evidence of research progress, and even her current arguments rely on her grades without addressing her research.  Horner-Neufeld also does not dispute that she lacked an advisor and a committee, nor does she provide any evidence to suggest that the University departed from academic norms.

Given that after six of the maximum ten years to complete a Ph.D., Horner-Neufeld had exhausted relationships with four co-advisors and a potential fifth advisor, had never submitted a complete thesis proposal, had struggled to win grants, and had not yet taken her comprehensive exam, her dismissal was not a substantial departure from accepted academic norms.

### D.    Implied Contract

Finally, Horner-Neufeld argues that the University's alleged failure to comply with its own regulations constituted a breach of obligations under an implied contract.  Horner-Neufeld also argues that we should impose an implied covenant of

---

[25]    *Hermosillo v. Univ. of Alaska Anchorage*, No. S-10563, 2004 WL 362384 at \*4 (Alaska 2004) (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)); *see also Bruner v. Petersen*, 944 P.2d 43, 48 (Alaska 1997).

[26]    *Ewing*, 474 U.S. at 225.

good faith and fair dealing as an additional term in this implied contract. The University argues there was no contract.

We need not decide whether an implied contract existed. As discussed earlier, the University complied with its policies in dismissing Horner-Neufeld such that it would not have been in breach even if a contract existed. And even if the University were required to act in good faith toward Horner-Neufeld, this covenant was surely satisfied by the University's efforts to help Horner-Neufeld find and maintain an advisor by providing financial support, monitoring the relationships, and attempting mediation, and by the evidence supporting our earlier conclusion that Horner-Neufeld's dismissal did not substantially deviate from academic norms.

## V.    CONCLUSION

For these reasons, we AFFIRM the superior court's decision.